CARAWAY, J.
| ,The traffic fatality in this case occurred in the rollover of a tractor-trailer truck on a rural parish road. The decedent failed to negotiate a curve in the road and the speed of the vehicle as a significant cause *1119 for the accident. The surviving family members instituted this action against the Parish claiming that the advance warning sign for the curve which was in place on the road should have also contained an advisory speed plate of 35 miles per hour (m.p.h.) to additionally warn drivers of the danger presented by the curve. Following a bench trial, the trial court in a written ruling denied plaintiffs’ recovery on the basis of causation, and this appeal ensued. Finding no manifest error in the trial court’s ruling, we affirm.

Facts

The surviving spouse and heir of Patrick M. Allums (“Allums”) bring this wrongful death action against the Parish of Lincoln and its Police Jury (hereinafter the “Parish”) following the wreck of a tractor-trailer truck in a curve on a rural road owned and maintained by the Parish. Allums was en route to an oil well drilling site near Quitman, and the accident occurred on the parish line outside of Arcadia. Plaintiffs’ case rests on the claim that the Parish failed to post an advisory speed plate beneath a reverse curve advance warning sign already in place on the road before the curve.
Allums began working for Lonestar Distribution, Inc. (“LDI”) as an experienced commercial truck driver on July 30, 2003. He drove semi-tractor trailer trucks and delivered cargo, including bulk product, from LDI’s Minden warehouse to various locations in northwest Louisiana. 12Allums made multiple deliveries in one workday, and generally worked overtime.
According to LDI’s records, Allums made his first delivery to the drilling site, known by the employees of LDI as “4-E Quitman,” on September 13, 2003. Allums made subsequent deliveries to the same location driving a flatbed 18-wheeler truck on September 18, September 25, October 8, October 14, October 15 (two trips), October 16 (two trips), October 19, October 23 (two trips), October 29, November 7 (two trips), November 10, November 20, and November 26.[1]
On December 7 and December 18, 2003, Allums delivered bulk barite loaded in a tanker truck to 4-E Quitman. LDI’s delivery tickets showed totals of 109 and 111 miles, respectively.
On December 23, 2003, the morning of the fatal accident, Allums and a co-employee, Willie Bennett (“Bennett”), left the Minden terminal driving separate tanker trucks loaded with bulk barite for delivery to 4-E Quitman. LDI’s bill of lading reflected that the truck was loaded with 23)4 tons of barite powder.
Bennett testified that he began using the road in question, Girl Scout Road, as the shorter delivery route to 4-E Quitman since before LDI acquired the company in 2002, both to avoid the train tracks in Arcadia and the red lights in Ruston. Bennett stated, “[I]t was a straight run over to [Hwy.] 147.” Bennett testified that he and Allums were together in the Minden office that morning when they “called the load in.” They drove in | standem on 1-20, where Bennett could look back and see Allums behind him, and they talked on the CB radio. The trial court’s ruling determined that Bennett did not observe Allums after exiting 1-20 at Arcadia. It was only after Bennett successfully delivered the barite to 4-E Quit-man that he received a phone call from LDI’s warehouse supervisor about Al-lums’s accident on Girl Scout Road.
*1120 Louisiana State Trooper Robert Patrick (“Trooper Patrick”) was dispatched from Troop F to investigate the accident, which he estimated to have occurred around 9:00 a.m. He arrived and saw the truck “upside down in the southbound ditch facing generally south approximately 25-30 feet west of the curved roadway.” The truck Allums was driving was an International Harvester commercial tractor and a Fruehauf dry powder vessel with two rear axles. As for the weather conditions, it was cloudy when Trooper Patrick arrived, and there had been occasional moderate showers earlier that day.
Girl Scout Road is an unmarked, two-lane paved road averaging between 19 and 21 feet in total width, and straddles the boundary between Bienville and Lincoln Parishes. Duaine T. Evans, a traffic engineering expert, testified that when traveling south on Girl Scout Road, the driver encounters a “reverse curve,” with the first curve turning to the “right.” The shoulder in the vicinity of the second or southernmost curve is where the accident occurred. Trooper Patrick testified that the distance of travel before the rollover was approximately 240 feet, from the tire marks at the west edge of the roadway, going into the grass and dirt of the shoulder and L ditch. The truck then traveled another 90 feet past the “crash scrub” before coming to a final resting point upside down. Allums died in the crushed cab as a result of the rollover.
After leaving Arcadia traveling east on Hwy. 80, Allums would have turned south on Girl Scout Road. Trooper Patrick did not observe a speed limit sign posted on Girl Scout Road between Hwy. 80 and the location of the accident, about 1.1 miles south of Hwy. 80. He testified that absent a posted speed limit, the speed limit is presumed to be 55 m.p.h.[2] Trooper Patrick described the curve where the wreck occurred as follows:
Q Okay. The shoulder in the vicinity of that second curve, that is the southernmost curve where the accident happened, how would you describe the shoulder and the ditch?
A There was nothing out of the ordinary as far as construction of the ditch or the area left or right of the roadway where the accident occurred. It was just a typical parish road.
Q All right. What about the shoulder? How would you describe any shoulder; there was or wasn’t?
A Oh, there was a dirt shoulder— grassy, dirt shoulder that — it had a low .slope to the ditch, approximately, I’d say, three feet; give or take.
Q You mean — what is the three feet, now? Is that the depth of it?
A From the edge of the roadway to the bottom of the ditch, approximately. It was just an approximation.
Q Okay. And how deep was the ditch?
A It varied anywhere from two and a half to three feet from the level surface of the roadway.
Q Did the roadway immediately start sloping down from the pavement into the ditch?
A No. I wouldn’t call it an immediate slope, just a low slope from the edge of the roadway to the — to the ditch.
The photos of the wrecked vehicle show that beyond the gentle sloping right-of- ■ way/ditch of the roadside was a fence and level pastureland.
*1121 |3At trial, Trooper Patrick testified he “had nothing to indicate specific speed at the time of the accident.” Trooper Patrick did testify concerning his investigation of the yaw and scratch marks caused by the truck’s tires on the road surface when it crashed:
Upon further investigation, it is my opinion the driver of vehicle # 1 was driving too fast to safely negotiate the medium left curve. The lateral scratches in the yaw mark indicated the driver may have been applying the brakes immediately before overturning vehicle #1.
Q You concluded that the driver of the vehicle, “ran off the road.” Is that right?
A That’s correct.
Q In your narrative you had indicated that you thought-whatever his speed might have been, that you thought he was going too fast to negotiate the medium left curve.
A That’s what I noted.
MR. BOLIN: Your Honor, as far as getting into speeds, I think that this is— he’s already testified that he has not done accident reconstruction training and any estimation of speed would be a guess, so I think getting him to estimate speeds is — is not appropriate here.
MR. BRENNER: Your Honor, I never asked to estimate speed. I was just asking if he was traveling too fast, whatever that speed may have been, to negotiate the “medium left curve” is what’ the officer noted.
A That is my opinion and I—
THE COURT: I’ll note the objection and make the answer-the question and the answer subject to it.
Q Go ahead Trooper. I’m sorry.
A I’m sorry. I didn’t mean to interrupt. That was solely my opinion based on the yaw mark, the skid mark. The striations of gravel that was in the mark before the crash it appeared to be was applying his brakes within two hundred feet of the crash area, and he just couldn’t negotiate the curve due — clue to his speed. And that’s based solely upon my opinion in observing and working these crash scenes before based on my — my experience.
In Joseph D. Blaschke, the Parish’s highway design and traffic engineering expert, based his testimony on the Manual on Uniform Traffic Control Devices (“MUTCD”),[3] stating that placement of the reverse curve warning sign can be made based on an engineering study or engineering judgment, based on an engineer’s experience and education. However, placement of an advisory speed plate warning to recommend diminished speed in a curve always requires an engineering . study. In this case, such engineering study would involve the use of a Ball Bank indicator test which is conducted by simply driving through the curve at various speeds. No evidence indicated that the Parish had conducted such a study. Blaschke also testified that the more familiar a driver was with the road, the less effective and necessary the warning signs were.
On cross-examination, Blaschke testified had he been advising the Parish:
[T]he first thing I would have done was — is to find out what the appropriate speed limit would have been for this road and then, based on that, put up the speed limit signs and then determine what the advisory speed plate would be, *1122 which would be, I think, around 35 miles an hour. And if that’s less than the speed limit that he posted, it’d be — I would recommend putting up an advisory speed plate 35 miles per hour with that reverse curve warning sign.
At the conclusion of cross-examination, Blaschke explained to the trial court the difference between advisory speed and critical speed. Advisory speed basically measures the “edge of comfort speed,” or the point where a driver would want to slide across the seat of the car. On the other hand, |7“critical speed” measures the speed at which you cannot make the curve, and the vehicle will slide off the road. Blaschke calculated the critical speed for the second curve on Girl Scout Road at “right around 50 to 55 miles an hour” based on his three tests with a Ball Bank indicator, conducted at 45, 40 and 35 m.p.h., respectively.
Duaine T. Evans, the plaintiffs’ expert, tested both curves with a Ball Bank indicator. He explained this was “a device that measures the side force as you travel around a curve.” Evans offered his expert opinion that in a southbound direction, the first curve could be negotiated at 55 m.p.h. He then testified that the appropriate speed for the second curve was 35 m.p.h.
Additionally, in a portion of Evans’s testimony specifically noted by the trial court in its written ruling, Evans addressed the effect of the existing curve sign as a warning to a driver, as follows:
Q. When a driver sees a reverse curve sign, as we see in our model without a speed plate and is shown under tab [four] C, what would he do to follow that sign?
A. Well, I assume he would, you know, if he was observant, he would prepare to negotiate through a reverse curve. It might involve slowing down a little; might not. It would depend on what he perceived when he saw it.
Q. Or is it because he ignored a warning sign that told him a curve was approaching, and warning signs tell you to adjust your driving accordingly, including slowing down?
A. He may have slowed down. We don’t know. But it doesn’t tell him how much to slow down.
The trial court received the following evidence by stipulation at the beginning of the bench trial:
There were two accidents: One-both in 1996 or 1997; one involving an employee of Shannon Wilhite; the other involving an employee of Charles Charter. Both accidents were on the curve in question, that is the one south of the Story |RRoad and the Girl Scout Road. In both cases the drivers were proceeding south. Both involved log trucks. In both the trucks overturned, the logs were discharged over the fence involved in the Allums’ (sic) accident and into the field adjoining Girl Scout Road.
The tractors in both cases were heavily damaged. As far as Lincoln Parish deputies, Mr. Wilhite would say a deputy was on the scene — a Lincoln Parish deputy was on the scene. In both cases the parties were sent to the emergency room.
Evidence regarding the accident history on Girl Scout Road was presented by excerpted deposition testimony of Pamela Duck, who was involved in an accident in the same curve when her northbound car ran off the road in the early morning of December 28, 2006. The logging truck accidents happened between 1996 and 1997 when loaded pulpwood trucks overturned in the same curve as they were headed southbound on Girl Scout Road. Pamela Duck’s deposition was admitted as Plaintiffs Exhibit 17, subject to the Parish’s objection.
*1123 Following the bench trial, the trial court handed down a written ruling listing the following facts:
• There was no posted speed limit for Girl Scout Road;
• When Trooper Patrick arrived at the accident scene, the weather was cloudy with occasional showers and it had previously rained at some point;
• The shoulder of the road was gently sloped and composed of grass and dirt;
• The tangent section or straight section between the end of the first curve and the beginning of the second curve was 153 feet;
• There were two potential causes of the accident attributable to Allums, either speed and/or steering;
• The “existing conditions” on the road can make a posted recommended speed inapplicable;
• There was no accident reconstruction evidence or any speed determination made for the trial court to consider; and
• The slope meter finding for the second curve was 35 m.p.h.
liiThe trial court’s brief final rationale for its ruling focused on the cause-in-fact element for a negligence claim and concluded:
In order to prevail it must be proved, by a preponderance of the evidence, that the lack of the speed recommendation sign caused the accident, in fact. In other words, the evidence must prove that it was more likely than not that the accident was caused by MR. ALLUM’S (sic) excessive speed and that the excessive speed was caused by the lack of a speed recommendation sign.
From the evidence before the Court, it is impossible to determine that the accident more likely than not occurred from one cause over the another. Speed of the vehicle, at the point where it left the road, was not calculated or estimated.
The court rendered judgment dismissing plaintiffs’ claims, and this appeal followed.

Discussion

I.

Appellant argues that the trial court erred when it granted a pretrial motion of the Parish and excluded evidence concerning the placement of an advisory 35 m.p.h. speed plate on the curve sign after the accident. The Parish filed a motion in limine to prohibit introduction of this evidence regarding subsequent remedial measures under La. C.E. art. 407.[4]
The trial court is granted broad discretion in its evidentiary rulings which will not be disturbed on appeal absent a clear abuse of discretion. Crisler v. Paige One, Inc., 42,563 (La.App.2d Cir.1/9/08), 974 So.2d 125. The prohibition against evidence of subsequent remedial measures is | mdesigned to bring within the scope of the rule any change, repair or precaution subsequent to an accident. Crisler v. Paige One, Inc., supra. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected La. C.E. art. 103(A).
*1124 The Parish’s action after the accident enhancing the warning of the reverse curve sign does fall within the category of a subsequent remedial measure. Plaintiffs’ offering of the remedial measure into evidence does not clearly fall within one of the exceptions to the rule of exclusion under Article 407. Moreover, Blaschke, the Parish’s expert, admitted in this testimony that according to data collected from his methodology, 35 m.p.h. was the proper cautionary speed for the curve in question. Thus, this evidence was presented to the trier-of-fact notwithstanding the ruling on the subsequent remedial measure. Accordingly, this assignment is without merit.

II.

At the outset we note that the trial court’s ruling recited the applicable law of negligence under La. R.S. 9:2800[5] as it relates to a public entity’s care and custody of its property that may be determined as defective or as presenting an unreasonable risk of harm. However, the plaintiffs’ claim rests on the alleged failed duty of the Parish to adequately warn Allums, | ¶ implicating Louisiana’s duty-risk analysis. Without any explanation, the trial court summarily stated that the plaintiffs had adequately proven that a defective thing in the custody of the Parish created an unreasonable risk of harm.[6] The court’s ruling then addressed the issue of whether “the defect was a cause in fact of the plaintiffs injuries,” and determined that “the lack of the speed recommendation sign” was not a cause-in-fact of the accident. Since we view the Parish’s alleged failure to post the advisory speed plate on the existing curve sign as an alleged failure to act to fulfill a duty, the duty-risk formula and analysis of our law is applicable.
The determination of liability in a negligence action usually requires proof of five separate elements: (1) proof that the defendant has a duty to confirm his conduct to a specific standard (the duty element); (2) proof that the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). Boykin v. Louisiana Transit Co., 96-1932 (La.3/4/98), 707 So.2d 1225.
 112Generally, the outset determination in the duty-risk analysis is the cause-in-fact. Id. Cause-in-fact is a “but *1125 for” inquiry which tests whether the accident would or would not have happened but for the defendant’s substandard conduct. Id. The trial judge’s finding regarding eause-in-fact is a factual finding which is entitled to great deference. Id. Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. Id.
In Perkins v. Entergy Corp., 00-1372, 1387, 1440 (La.3/23/01), 782 So.2d 606, 612, the Louisiana Supreme Court made the following observation concerning the substantial factor test:
This court has made several different inquiries when applying the substantial factor test. For example, the court has stated that when thei’e are multiple causes, clearly cause-in-fact exists when the plaintiffs harm would not have occurred absent the specific defendant’s conduct. Graves v. Page, 96-2201, (La.11/7/97), 703 So.2d 566, 570. The court has also applied the substantial factor test by asking whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred “but for” each individual cause. See id. (citing Trahan v. State, Department of Transportation & Development, 536 So.2d 1269, 1272 (La.App. 3d Cir.1988)). See also Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law, § 4-3 at 86-88 (1996) (noting that the substantial factor test operates well in eases where there are multiple possible causes-in-fact, but the trial judge or jury may not be able to conclude that the accident most likely would not have happened but for any one of the causes). Additionally, in LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475 (La.1978), the court, in describing the substantial factor test, stated that “one must consider whether the actor’s conduct has created a force or series of forces which ai-e in continuous and active operation up to the time of the harm.”
This is a case with multiple causes-in-fact asserted by the parties. The two causes that are alleged to have played a role in this accident are the | isspeed of the driver and the lack of adequate warning to reduce speed through the curve. Allums’s duty not to drive at an excessive rate of speed and the Parish’s duty to warn drivers to reduce their speeds do not address independent safety factors for the highway, but the same issue of safe speed. If the Parish had completely failed to give any warning, or if Allums’s speed was excessive for any highway, either party’s act might be determined as the sole cause-in-fact for the accident. Nevertheless, the Parish’s actions with the road did give some warning pertaining to the necessity for caution through the curve. Also, Al-lums did not drive his track through the reverse S-curve at 65 m.p.h.; otheiwise, the wreck would have occurred in the first turn. We must therefore examine the facts concerning these two causes and their relationship that allegedly played a role in this accident to determine whether the trial court’s ruling on the cause-in-fact for the accident is manifestly erroneous.
The first claim for the accident’s cause is that the Parish failed to warn Allums. The premises underlying the plaintiffs’ claims are that a vehicle could travel 55 m.p.h. on this rural road without violating the law, that the curve where the wreck occurred had a measured advisory speed of 35 m.p.h., and that the Parish did not warn Allums to reduce his speed to 35 m.p.h. Nevertheless, this narrowly framed emphasis overlooks the facts which demonstrate that Allums did receive warnings regarding his speed on Girl Scout Road. *1126 This is not a total failure to warn situation. The question | ^presented regarding the Parish’s conduct concerns the adequacy of the warnings that Allums received.[7]
In the first place, the reverse curve sign on Girl Scout Road is a warning to the driver regarding speed and the need to drive the vehicle with additional caution. As noted in the trial court’s ruling, plaintiffs’ expert agreed that depending on the circumstances observable by the driver, the reverse curve sign alone, without an advisory speed plate, cautions the driver to slow down. This is particularly true on a rural service road which is not a major two-lane state artery. The observable general conditions of Girl Scout Road were not lost on the trier-of-fact in this case, nor can they be lost on this court. Girl Scout Road is a narrow roadway on which the Parish had not marked either white center lines or fog lines. The lack of these markings for this narrow road, which is not asserted as a safety deficiency in this rural setting, is an important general condition of the roadway indicating the need for a reduced speed. The Parish posted no speed limit on this road. Again, this is not asserted as a safety deficiency. Trooper Patrick’s observation that the speed limit is presumed 55 m.p.h. does not mean that 55 m.p.h. is a safe speed even on a straight-of-way on Girl Scout Road for a large commercial vehicle. The narrow 20-foot width |lsof the road,[8] without significant shoulders, is observable by all drivers and should indicate to the driver of a large truck the need for caution when meeting oncoming vehicles. As Allums approached the reverse curve, any oncoming vehicle would not be seen, and the possibility for a vehicle to appear acts as a cautionary condition requiring the reduction of speed. A final important fact concerning the driver’s warning regarding speed is the large, top-heavy load carried in the V-shaped tanker truck which Allums drove. The tanker’s high center of gravity and the centrifugal force acting upon that load through both curves suggest the further need for a reduced speed by the truck driver.
There are two other circumstantial factors which arguably gave further warning to Allums. The trial court specifically noted that there was circumstantial evidence indicating that the road may have been wet at the time of the accident. Additionally, Allums may have traveled on Girl Scout Road for other trips to the 4-E Quitman well site. While these matters are greatly contested by plaintiffs, the test for such circumstantial evidence is whether a reasonable inferencé may be drawn by the trier-of-fact from the proven circumstances. The wet roadway may be a difficult inference to credit, given the great *1127 length of time after the accident until the discovery of the wreck and the authorities’ arrival at the crash scene. Nevertheless, from our review of the evidence, there is a strong and reasonably supported inference that Allums had previously used Girl Scout Road. The other LDI l^driver, Mr. Bennett, reported losing contact with Allums at Arcadia, which is miles to the west of the cut-off from Hwy. 80 onto Girl Scout Road. Also, State Hwy. 147 is the main artery leading south from Arcadia toward Quitman. A route heading east out of Arcadia on Hwy. 80 would not be the route to Quitman, and the driver would need prior knowledge of Girl Scout Road which cuts down southward back to Hwy. 147. Likewise, Allums had made numerous pri- or trips to the 4-E Quitman site, indicating a greater possibility for travel on Girl Scout Road. These circumstantial conclusions which the trier-of-fact could reach suggest that Allums had prior knowledge, and thus warning, of the general condition of the road and the curve in question.
From this review of the warnings presented by the circumstances on Girl Scout Road, including the reverse curve sign, we disagree with the view that Al-lums did not receive warning to reduce his speed well below 55 m.p.h. as he proceeded through the two curves in question. If the truck’s speed was at or near that higher level of speed, a trier-of-fact could conclude that Allums’s disregard of the existing warnings for reduced speed on the road was the sole cause-in-fact of the accident. On the other hand, only in the event of an accident at a reduced speed, closer to the 35 m.p.h. advisory speed measured for the second curve, might the Parish’s failure to post an advisory speed plate be viewed as playing so important a role in causing the accident to be a cause-in-fact.
From this view of the accident setting and with the substantial factor test for the measure of the two alleged causes for the accident, the trial court |17was justified in its ruling that the speed of the truck at the time of the accident was a critical fact which the evidence at trial did not calculate or estimate. Circumstantially, from the testimony of the investigating officer, the truck’s speed could have been 50 m.p.h. or greater. It was the plaintiffs’ burden to show specifically a lower speed to implicate the Parish’s alleged nonfea-sance as a substantial factor in causing the accident. The higher speed suggested by the record was excessive because it occurred in a setting with numerous warnings for reduced speed, and Allums received those warnings. Therefore, implicit in the trial court’s analysis and ruling was that Allums’s disregard of those warnings was the sole cause of the accident. Under the manifest error standard of review, the trial court’s conclusion was not clearly wrong and the judgment is affirmed.

Conclusion

For the above reasons, the decision of the trial court is affirmed. Costs of the appeal are assessed to appellants.
AFFIRMED.

. Allums's particular delivery routes are unknown and were described by his supervisor as discretionary for all drivers.

. La. R.S. 32:62 provides in part:
A. No person shall operate any freight carrying vehicle upon the highways of this slate at a speed in excess of fifty-five miles per hour....

. The MUTCD is incorporated by reference in 23 C.F.R. § 655 and shall be recognized as the national standard for traffic control devices on all public roads open to public travel.

. La. C.E. art. 407 provides:
In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent remedial measures is not admissible to prove negligence or culpable conduct in connection with the event. This Article does not require' the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility.

. La. R.S. 9:2800 provides in part:
C. Except as provided in Subsections A and B of this Section, no person shall have a cause of action based solely on liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and failed to do so.

. An appeal lies from the judgment, not the reasons therefor. Martin v. Brister, 37,011 (La.App.2d Cir.7/23/03), 850 So.2d 1106, writ denied, 03-2374 (La.11/21/03), 860 So.2d 550; Temple v. Shannon, 505 So.2d 798 (La.App. 2d Cir.1987). We therefore do not place any weight on the trial court's finding of an unreasonable risk of harm, nor do we reach the duty, breach and legal cause elements of the duty-risk analysis where policy considerations, similar to those for the determination of unreasonable risk of harm, are weighed. We affirm the trial court’s ruling concerning the threshold cause-in-fact requirement which is applicable under both the duty-risk analysis and the analysis for liability for things in one’s custody.

. While the trial court's brief analysis quoted above focused on the determination of the lack of evidence of the vehicle's actual speed, the other alleged cause of the accident concerning the Parish's failure to warn was also referred to in that analysis ("one cause over the other”) and certain warning indicators which Allums received were mentioned in the court’s written listing of the facts. Thus, we disagree with appellants' argument in their brief that the trial court's analysis erroneously addressed only the causative factors of the driver's speed and his steering of the vehicle, and that the “substantial factor” test was nowhere applied in the trial court's ruling comparing Allums's excessive speed and the Parish's failure to post the advisory speed plate. Moreover, regardless of what is contained in a trial court's written ruling, whether brief or even incomplete, our review is of the judgment or ultimate result. Temple v. Shannon, footnote 8, supra. Therefore, we have considered the entire record regarding the evidence pertaining to the adequacy of the warnings which Allums received.

. From our review of La. R.S. 48:35(C) and the regulations of the Department of Transportation and Development, Office of Highways/Engineering (LAC 70:1.1301, et seq.), Girl Scout Road’s width appears to be less than the required width for such rural roads.