PEATROSS, J.
liThe Living Epistle Church (“the Church”) sued the City of Shreveport (“the City”) for damages to its sanctuary building allegedly caused by a leaking sewer main. The trial judge heard testimony from the pastor of the Church, Reverend Roy King, and several experts and ultimately concluded that the Church had carried its burden of proof and awarded $150,000 in damages. The City appeals, arguing that the claim has prescribed and, alternatively, that the Church failed to prove that the sewer main leaked or that any leak was the cause of the damage to the sanctuary. The Church has answered the appeal seeking an increase in damages to $300,000 and attorney fees of $10,000. For the reasons set forth herein, we reverse the judgment of the trial court and render judgment in favor of the City, dismissing the claims of the Church with prejudice.

FACTS

In September 2002, The Living Epistle Church purchased the property and buildings located at 3816 Virginia Avenue in Shreveport, formerly Wynn Methodist Church. At issue in the current litigation is the sanctuary building, which is a wood frame building with brick veneer constructed in the 1940s or 1950s. There is a concrete basement below the southern half of the building. The floor of the sanctuary is supported by the concrete basement walls and steel pipe columns. At the time of the purchase of the property by the Church, there was an existing 8in. sewer main running in an east/west direction 52 ft. 9 in. north of the north wall of the sanctuary building and 84 ft. 9 in. north of the basement of the sanctuary. The original sewer main had been in place since the 1920s; and, |2since that time, a two story building (not the sanctuary building at issue) had been erected on top of the line.
The record reflects, and it is undisputed, that beginning in March 2006, the Church began experiencing problems with liquid accumulation in the basement of the sanctuary building. Rev. King testified that the City was called on at least four occasions to pump the liquid out of the basement. The City responded promptly each time and pumped the liquid out of the basement at no charge to the Church. According to Rev. King, the liquid had the odor of sewage, which was detectable in the worship area on the main floor of the building. Rev. King further testified that, when he would smell the odor, he would check the basement and find it filled with raw sewage. He would then call the City to come pump the basement.
In July 2006, the City rerouted the original sewerage main and capped off the line *1196 at the manhole at the northeast corner of the sanctuary building. The line was then run in a southerly direction along the east wall of the sanctuary building, 24 ft. east of the east wall. Rev. King testified that there were no further problems after the rerouting of the sewer main.
The record contains the following accounts of what prompted the City’s decision to reroute the original sewer main. Dexter Grogan, a civil engineer with the engineering and surveying firm of NTB and Associates, evaluated the damage to the sanctuary building and testified as an expert for the City. Mr. Grogan testified and stated in his report that, according to Rev. King, the original sewer main (north of the sanctuary) had clogged and cracked, and that in March 2006 “the City investigated complaints from the | ¡¡church of sewerage backing up through the toilets of the church.” We note at this juncture that this is the only mention in the record of toilets backing up in the church. In fact, Rev. King testified that the only toilet in the basement of the sanctuary was non-functioning and that the alleged sewage in the basement was not from overflowing toilets, but from an outside source that was breaching the walls of the basement.
Since a structure was in existence over the main line, the City capped the line and rerouted the line down the east side of the sanctuary building. Ali Mustapha, the assistant city engineer, testified on behalf of the City that he was in charge of the rerouting of the sewer main at the Church. Mr. Mustapha explained that “somebody called” the City about the line being under a structure and he was asked to investigate rerouting the line. Finding it economically feasible, the City made the decision to reroute the line by removing the sidewalk down the eastern side of the sanctuary and replacing the sidewalk. Mr. Mustapha confirmed that no complaints had been made since the installation of the new sewer line.
Rev. King further testified that he first noticed the damage to the sanctuary on “the very day [the City] started the construction” on the new sewer main. Specifically, the walls on the east and west sides were leaning outward, with the east wall being the most pronounced, and the roof was sagging on the east side of the building. Rev. King contacted Gary Fenner, a civil and structural engineer and President of Fenner Consulting, LLC, to evaluate the building and ultimately obtained an estimate of cost of replacement from architect Misha Ferrell. Based on the information | ¿provided to him by Rev. King, Mr. Fenner opined that “an outside source” which “could have been the leaking sewer main” introduced enough water into the soil beneath the sanctuary basement to cause massive foundation failure. The Church filed suit for damages on July 12, 2007, alleging that the City’s failure to timely repair a leak in the sewer main prior to the installation of the new main line on or around July 14, 2006, caused the damage to the sanctuary building. At the conclusion of the Church’s evidence, the City moved for an involuntary dismissal based on prescription, which was denied. As stated, after the conclusion of the trial on the merits, the court rendered judgment in favor of the Church and awarded $150,000 in monetary damages. This appeal ensued.

DISCUSSION

On appeal, the City urges the following four assignments of error:
1. The Trial Court committed legal error in denying Plaintiffs Oral Motion for an Involuntary Dismissal based on Prescription.
*1197 2. The Trial Court committed legal error in ruling Plaintiffs proved the sewer line leaked.
3. The Trial Court committed legal error in ruling the leaking sewer line caused damage to the church’s sanctuary building.
4. The Trial Court’s award of $150,000 for damages allegedly sustained to the church’s sanctuary building was excessive and a clear abuse of discretion.

Assignment of Error No. 1: Prescription

Delictual actions are subject to a one-year period of liberative prescription which commences to run from the day injury or damage is | ¡¡sustained. La. C.C. art. 3492. The burden of proving that the suit has prescribed rests with the party pleading prescription. Boyd v. B.B.C. Brown Boveri, Inc., 26,889 (La.App.2d Cir.5/10/95), 656 So.2d 683, writ not considered, 95-2387 (La.12/8/95), 664 So.2d 417.
The City argues that the claims of the Church have prescribed because suit was filed on July 12, 2007, more than one year from June 2006, when the rerouting of the sewer line was completed by the City and when Rev. King first noticed the damage to the building. The City suggests that Rev. King testified that the work was done in June 2006. A complete reading of the record, however, reveals that, although Rev. King agreed to a statement made by counsel that the rerouting work was done in June 2006, he later expressly stated that the work was done in July 2006. Further, the petition alleges that the work was done on or about July 14, 2006, and Mr. Musta-pha testified that the work was done “sometime in July 2006.”
Prescriptive statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; of two possible constructions, that which favors maintaining, as opposing to barring, an action should be adopted. Boyd, supra, citing Lima v. Schmidt, 595 So.2d 624 (La.1992). Based on our review of the testimony, we find no error in the trial court’s conclusion that the City failed to carry its burden of proving that the claim was prescribed. We, therefore, find no error in the denial of the City’s motion for involuntary dismissal.
| (Assignments of Error Nos. 2 and 3: Existence of Leak and Causation
In a civil suit, the burden is on the plaintiff to prove the negligence of the defendant by a preponderance of the evidence. Stone v. Bullard, 43,996 (La.App.2d Cir.1/28/09), 2 So.3d 1241. Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/ risk analysis, which entails five separate elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) whether the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element). Id.
If the plaintiff fails to prove any one element by a preponderance of the evidence, the defendant is not liable. Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318.
In Assignment of Error No. 2, the City challenges the factual findings of the trial court that there was a leak in the original sewer main and that the alleged *1198 leak caused the damage to the sanctuary building. It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). Under this standard, the appellate court will review the entire record to determine whether the trial court’s findings were clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. and Dev’t., 617 So.2d 880 (La.1993). In order to reverse, the appellate court must find that a reasonable basis does not exist for the finding of the trial court and that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987).
Generally, the outset determination in the duty-risk analysis is the cause-in-fact element. Allums v. Parish of Lincoln, 44,304 (La.App.2d Cir.6/10/09), 15 So.3d 1117, writ denied, 09-1938 (La.11/20/09), 25 So.3d 803. As a threshold issue, however, we will first address the argument of the City that the Church failed to prove the most essential fact, that there was a leak in the original sewer main. After an exhaustive review of the testimony and engineers’ reports, we can find little, if any, evidence that proves the existence of a leak in the original sewer main that was located 84 ft. 9 in. north of the sanctuary basement.
Rev. King testified that he smelled and observed raw sewage in the basement of the sanctuary building, but he had no direct knowledge of the source of the alleged sewage. As previously mentioned, he testified that the only toilet in the basement of the building was non-functioning and speculated that the source of the alleged sewage was a leak in the original sewer main. Significantly, however, Rev. King was mistaken as to the location of the original main line. He testified that the line ran parallel to the east wall of the sanctuary, which is actually where the newly rerouted line ran — not the original main line which, as stated, was actually located 84 ft. 9 in. north of the basement of the sanctuary building. In order for raw sewage to enter the basement of the building, it would have to travel the 1884 ft. 9 in. to even reach the wall of the basement. The experts agreed that it would be highly unlikely for sewage to travel in the ground in excess of 84 ft. to fill the bottom of the basement of the sanctuary.
The existence of a leak and the mistaken assumption regarding the location of the original main line was apparently related by Rev. King to the Church’s expert, Mr. Fenner. Thus, Mr. Fenner relied on these representations in forming his opinion that a sewage leak could have caused the damage to the building. Notations in Mr. Fen-ner’s letter to Rev. King reference “coincidental” repairs to the sewer line (rerouting the line to run parallel to the damaged east wall) at the time the damage to the east wall became apparent to Rev. King. Mr. Fenner had no direct knowledge of any leak in the original main line prior to the rerouting work.
Further, Mr. Grogan testified and stated in his report that an investigation by the City revealed a clog in the original sewer main that was located underneath the two-story building (not the sanctuary) and that was causing the toilets to back up in the sanctuary building. Nowhere in Mr. Gro-gan’s report does he indicate that a leak in the original sewer main and the complaints of the Church precipitated the rerouting of the line.
Lonnie Faust, the assistant superintendent over water, sewer and maintenance for the City, also testified that the reason for the rerouting of the line was not due to a leak in the original main. He further testified that there were no visible signs of a leak above the ground, ie., a cave-in of the soil around the main line. When asked *1199 if it was even possible for sewage to migrate from the original line to the basement of the sanctuary building and |sdo damage, Mr. Faust answered “No sir. I don’t think that’s going to be possible.”
In addition, Loyd Hoover, a geotechnical engineer, provided expert testimony on behalf of the Church regarding soil borings completed by him to test the soil for organic matter at the base of the east wall of the sanctuary. Mr. Hoover testified that he drilled five soil borings, each ten feet in depth, in the area in which he was told by Rev. King that the sewer main was located — to the east of the sanctuary. Mr. Hoover collected the sterile specimens, tested them for organic matter and found none. Mr. Hoover opined, however, that, based on the history provided him by Rev. King, the lack of organic matter still did not preclude damage from leaking water (not sewage) which would cause expansion in the clay and, ultimately, damage to the foundation of the building. When questioned about the source of the water in the basement, Mr. Hoover responded, “I don’t have an opinion on where it came from. I was told it was — I don’t know where the water came from. I have no way of knowing where the water came from.”
In summary, there is scant evidence, consisting of the speculative testimony of Rev. King, that suggests that a leak existed in the original sewer main. We find, therefore, that the record lacks a reasonable basis on which to so conclude.
Assuming arguendo, however, that there was a leak in the original sewer main, we further find no reasonable basis in this record on which to conclude that any such leak was the cause-in-fact of the damage to the | insanctuary building. Cause-in-fact is a “but for” inquiry which tests whether the accident would or would not have happened but for the defendant’s substandard conduct. Id. The trial judge’s finding regarding cause-in-fact is a factual finding. Allums, supra.
In the case sub judice, there is no question that the sanctuary sustained damage. The Church claims that a leaking sewer main caused the damage; therefore, the question before us is “but for” the alleged leak in the original sewer main, whether the sanctuary would have sustained the damage at issue. Rosell, supra. While the City and the record present various possible causes of the damage to the sanctuary building, we are not faced with the question of what could have caused the damage. As a reviewing court, we must only decide whether the record contains a reasonable basis on which to find that a leaking sewer main caused the damage. In addition to the testimony and evidence discussed earlier in this opinion, the following testimony and our observations therefrom lead us to conclude that the trial court was manifestly erroneous in finding that a leaking sewer main caused the damage:
• Mr. Faust testified that he responded to the calls of the Church to pump standing water out of the basement of the Church on at least three occasions prior to July 2006. On each occasion, the water was clear and had no odor. He stated, “the times I went out there the liquid, the water was clear, fairly clear, and had no scent of sewer. It didn’t smell like — as much water was in that basement it would smell like sewer.” Mr. Faust further testified that he pumped the water out as a courtesy and was never of the opinion that it was a problem with a sewer line. He emphatically testified that he “could not justify or sit here and tell you that the sewer coming here went inside the basement ... I don’t see how it could happen.”
In*Following the rerouting of the sewerage main, a meeting was held at the *1200 Church with Mr. Faust, Rev. King and others present. Mr. Faust testified that there was still standing water present in the basement following the work, at which time he concluded that the water must be from another source. He stated, “well, it was basically the same scenario. It was just not a sewer smelling liquid. It was just what I considered fairly clear water .... still had water in the basement after we rerouted.”
• Ms. Ferrell, the architect hired by the Church, testified that she met Rev. King at the Church to evaluate the building from a restoration or replacement viewpoint. Her evaluation took place in late 2008, approximately a year and a half after the rerouting of the sewer main. Recall that Rev. King testified that there were no further problems following the rerouting work. Ms. Ferrell, however, testified that there was standing water in the basement during her visit. She stated, “We looked underneath the basement. It had liquid in it, water I’m assuming. So I did not wade in and it was dark.”
• Mr. Grogan testified that there were no sink holes or erosion in the area of the original main line. He further testified that there could not have been sewer water from the original main line, 84 ft. 9 in. to the north of the basement, breaching the east basement wall of the sanctuary. He opined that “the soil down at the sanctuary at the base of the sanctuary footing is probably always damp anyway. It probably never dries out down that deep.”
• Mr. Mustapha testified that he was also present at the post-rerouting meeting at the Church. Like Mr. Faust, Mr. Mustapha testified that there was “water sitting there in the basement” at the time of the 2008 meeting. He went further to state that “It’s almost the same thing I saw six, seven, eight years before it’s the same thing I saw ... That tells me there’s water in there. It’s a low area that’s either from rain water, ground water_” Mr. Mustapha also did not notice any erosion on the ground level.
Based on the totality of this evidence, we conclude that the trial court’s determination that any alleged leak in the original sewer main that was located north of the sanctuary building was a cause of the damage to the building was manifestly erroneous and is simply not supported by the | ^record. We recognize that the trial court indicated that it had made a credibility determination in favor of the Church’s experts; however, the opinions of Mr. Fenner and Mr. Hoover must be discounted because they were admittedly based on information provided by Rev. King that there was, in fact, a leak in the sewer main and the erroneous assumption of where the alleged leaking sewerage main was located. Furthermore, we stress that there is much discussion in the testimony and reports of the experts regarding the existence, age and prior repair of cracks in the exterior brick veneer, cracks in the concrete walls of the basement and failing trusses in the attic of the building and various opinions regarding possible causes therefor. Again, there is no dispute that there was damage to the building, by water or otherwise. Our holding herein is limited to the specific issue of the proof before us and our limited finding is that the Church failed to carry its burden of proving that a leak existed in the original sewer main, prior to its rerouting in July 2006, and that the alleged leak caused the complained of damage. A negative answer to any of the inquiries of the duty/risk analysis results in a determination of no liability. Mathieu, supra. We, therefore, *1201 reverse the judgment of the trial court finding the City hable for damages to the Church and dismiss with prejudice the claims of the Church.
In light of our conclusion herein, we pretermit any discussion of Assignment of Error No. 4 regarding damages and the answer to the appeal seeking an increase in damages.
1 ^CONCLUSION
For the foregoing reasons, the judgment of the trial court in favor of The Living Epistle Church is reversed and judgment is rendered in favor of the City of Shreveport. The claims of The Living Epistle Church are dismissed with prejudice. Costs of appeal are assessed against The Living Epistle Church.
REVERSED AND RENDERED.