BROWN, Chief Judge.
[,Defendant, Elizabeth Taylor Smith, was convicted by a jury of second degree cruelty to a juvenile, a violation of La. R.S. 14:93.2.3. She was subsequently sentenced to 15 years at hard;-labor, without benefit of probation, parole or suspension of sentence. A motion to reconsider sentence was filed and denied. Defendant appealed.' We affirm her conviction, amend her sentence, and as ariiended, affirm. '

Facts

The juvenile involved in this case, N.L., was born on.April 25, 2009, premature at 24 weeks gestation, and was in the hospital for three months after her birth. She was released from the hospital to her biological parents, but N.L. and her siblings were removed from the home and placed with N.L.’s paternal grahdmothér in September of 2010. On' February 17, 2011, N.L. was removed from her grandmother’s home, and she and her three-year-old sister, R.L., were placed in foster care in the home of defendant until their removal on May 3,2011.
In defendant’s home, N.L. suffered the injuries which gave rise to the- instant charge against, defendant. Specifically, around 12:30 a.m. on May 2, 2011, defendant, with R.L. in her arms, went to the home of her neighbor, Victoria Jones,- and told her that N.L. had fallen out of bed. The women left R.L. with Ms. Jones’ daughter, Lakadrian, and went to see about N.L. Ms. Jones testified that she observed defendant pick up N.L. off of the bed in the guest bedroom.. =Ms.'Jones further testified that N.L. was “foaming at the mouth” and acted like “she wanted to go-to sleep.”- Ms.’Jones asked'defendant if she had called 911 and defendant' told her that she had not, so |2Ms. Jones told defendant to do so. The audio recording of the 911 call was introduced "into evidence and played for the jury; Ms. Jones testified that, while waiting for the ambulance, defendant asked her to say that she, Ms. Jones and her daughter, had been earing for N.L. ánd R.L. the previous day. Defendant, who was an in-home sitter for a private company, GB Cooley, was afraid of losing her job because she had taken N.L. and R.L. to work with her in one of her client’s homes the previous day. Initially, Ms. Jones agreed to do as defendant asked. The ambulance then arrived and defendant went with N.L. to the hospital.
Defendant ■ told the emergency room physician, Dr. Randy Davis, that she had heard N.L. scream and that when she went to N.L.’s room, she was on the bed and appeared to be having some type of seizure. Dr. Davis examined .N.L. and found her to be alert and. fussy, but not in acute distress. He did not remove her clothes because the only report was seizure. He palpated N.L.’s head and found nothing of significance; After a consult with a neurologist regarding the report of a seizure, Dr. Davis discharged N.L. at approximately 5:30 a.m. with instructions for defendant to' take N.L; tó her pediatrician later that morning.
Ms. Jones drove defendant and N.L. to the pediatrician at 9:00 a.m. and N.L. was seen • by nurse practitioner, Robin St. Pierre.. Defendant again reported that she heard N.L. cry out and that she found N,L. in her bed appearing, to have a seizure. Defendant did not state that N.L. ■had fallen out of the bed. She reported that N.L. was sleepy, would not drink and was fussy. Ms. St. Pierre consulted Dr. Kim Malmay -at St. Francis Medical IsCenter and, ultimately, N.L. -was admitted to the pediatric unit of the hospital. At this point, N.L. underwent a full examination by Dr. Malmay which revealed a scrape to her noseband lip and, upon examination of her head, several large subgaleal *707 hematomas, which are a collection or pooling of blood between the outer covering of the skull bone and the scalp. Dr. Malmay testified that the hematomas were from separate injuries consistent with blunt force trauma. Dr. Malmay farther noted malnourishment and bruising up and down N.L.’s back, right inner thigh, right shoulder, and left ankle and wounds to both knees. He testified that the coloring of the bruises indicated that some of the bruises were about a week old and some were newer. In addition, a CT scan revealed a skull fracture, subarachnoid hemorrhaging and swelling of the brain. Dr. Malmay stated that N.L.’s brain had actually shifted inside her skull. Dr. Malmay opined that the injuries to N.L. were not consistent with falling off of a bed or falls from a walker; rather, the injuries were from physical, nonaccidental trauma.
Neurologist Jose Bermudez examined N.L. in the PICU, and he testified at trial that the subgaleal hemotomas in different areas of N.L.’s skull indicated separate blows to the back of her head. He explained that the type of injury suffered by N.L. leads to death of brain tissue. Defendant reported to Dr. Bermudez that N.L. had fallen off of the bed to the floor, about a 24-inch drop. Dr. Bermudez testified that such a fall would not have caused such extensive injuries; he opined that N.L.’s injuries were caused by nonacci-dental trauma or child abuse and had been inflicted within 24 to 48 hours of her admission to the hospital. Finally, Dr. DBermudez testified that he examined N.L. two years after the injuries and she was unable to hold her head up, sit or stand on her own, or express herself verbally. He further questioned her ability to see.
Dr. John Barraza, a neuroradiologist, corroborated much of the medical testimo--ny and confirmed that the head injuries sustained by N.L. would have impaired her thought processing and vision. Photographs of N.L.’s injuries were introduced into evidence.
' N.L. and R.L. were removed from defendant’s foster care and a complaint was sent to the proper officials. Investigator Jo Caston with the Ouachita Parish Sheriffs Department received the report of suspected abuse and questioned defendant. Initially, defendant told the investigator that Ms. Jones and Lakadrian had been watching N.L. and R.L. the day of the injuries. Following this statement, Investigator Gaston took statements from Ms. Jones and Lakadrian and learned that they had not been caring for the children. Thereafter, in her second interview, defendant changed her story and admitted that she had taken N.L. and R.L. to work with her that evening. Defendant admitted having the two girls in her care for the 24 to 48 hours preceding her call to 911.
Defendant also testified at trial. She explained that she was certified as a foster parent and that N.L. and R.L. were the second set of children that had been placed in her care. Defendant explained that, on the evening of the incident, she had taken both girls to work with her. She testified that she got off work at 11:30 p.m., drove home, put the girls in their beds and went to sleep. At 12:30 a.in. defendant heard a scream and went to N.L.’s |sroom and saw her on the floor. Defendant testified that N.L. appeared to be having a seizure. She stated that she sent R.L. across the street so that defendant could “tend to”' N.L. Defendant explained that she lay down with N.L. for a few minutes until she stopped crying and then she went across the street to Ms. Jones’ residence. At that point, according to defendant, Ms. Jones accompanied her back to her home where Ms. Jones observed. N.L. and advised defendant to call 911, which she did. Defen *708 dant testified that she had not called '911 yet because she had planned to take N.L. to the hospital in hex- vehicle. Defendant testified that she was unaware.of most of the bruising on N.L. until the doctor showed her. She testified that the bruising on N.L.’s lower back was from her walker and that the wounds on her knees were from crawling and falling. She maintained in her testimony that the only trauma N.L. had sustained in the 48 hours prior to defendant calling 911 was the fall from the bed. Defendant explained that she asked Ms. Jones and Lakadrian to lie for her and say that they had been caring for the girls while she was at work, not when N.L, was injured. • Defendant conceded that N.L. was injured while in her care, but, again, insisted that the only trauma of which she was aware was the fall from the bed.
Sarah Green, defendant’s immediate supervisor with GB Cooley, testified for the defense. Ms. Green stated that defendant was a “great employee” who seemed to care about her clients, did extra duties when called for, bought gifts for her clients and, generally, did whatever was necessary to make her clients happy. Ms. Green testified that she was | (¡unaware that defendant had brought her foster children to work with her until after the arrest.
Edwina Kirkland, Human Resource Generalist for GB Cooley, also testified for the defense. Ms. Kirkland stated that she hired defendant and that there had never been any corrective action taken for defendant. Ms. Kirkland testified that defendant was a “very good employee” and that défendant maintained her training required to work as a sitter with the company.

Discussion

Denial of Motion for New Trial

We will first discuss the motion for new trial as it raises the issue of a sufficiency of the evidence.
Defendant states that the evidence against her was -all circumstantial 'and that there was' no direct evidence that she caused the injuries to N.L. In addition, she further argues that the district attorney’s improper comment and the trial court’s failure' to grant a mistrial warranted the granting of a new trial.
La. C. Cr.,P. art. 851, Grounds for New Trial, provides, in pertinent part:
A. The motion for a new trial is based on- the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
B. The court, on motion of the defendant, shall grant a new trial whenever any of thfe following occur:
(1) The verdict is contrary to the law and the evidence.
|7(2) The court’s ruling on a written motion, or an objection made during the proceedings, shows prejudicial error. . .
[[Image here]]
(5) The court is of the opinion that the ends of,justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right
[[Image here]]
The decision on a motion for new trial rests within the sound discretion of the trial judge and will not be disturbed on appeal absent' a clear showing of abuse. State v. Horne, 28,327 (La.App. 2d Cir.08/21/96), 679 So.2d 953, writ denied, 96-2345 (La.02/21/97), 688 So.2d 521.
In her motion for new trial, defendant argued that the evidence was insufficient to support the- conviction. In ad *709 dressing this argument, the trial judge stated that he found it to be “very clear” that the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), had been met by the evidence adduced by the state at trial. Specifically, the trial judge noted the “devastating” testimony of the expert witnesses who examined N.L. An examination of the record for sufficiency, clearly supports the trial judge’s denial of a new trial on this basis.
Janine Brown, the state foster care worker assigned to N.L., testified on behalf of the defense. During questioning, defense counsel attempted to elicit testimony about what defendant had reported to Ms. Brown regarding N.L.’s behavior prior to the instant injuries. The following colloquy transpired:
DA: But, Your Honor, this is hearsay. Janine Brown is testifying to what the defendant said. That’s what she is reporting to |sDetective Caston, not what she’s ever observed personally. She’s testifying to what she said. If she wants to say it she should get on the stand. It’s not — I mean it’s her client so it can’t be an admissioii against interest.
[[Image here]]
Court: Just a minute. You, can’t comment on whether the defendant takes the stand or chooses not to take the stand. The jury is to be instructed that a defendant has a right not to take the witness stand, an' absolute constitutional right.
DA: That’s correct, Your Honor. I apologize.
Court: And that cannot be against her. That comment was improper.
Defense counsel: Your Honor, and out of an abundance of caution we will ask for a mistrial at this time.1
Court: Denied. Proceed.
Defendant argues that this comment resulted in her “having” to take the stand and, thus, was a violation of her constitutional right to choose not to testify and warranted the granting of her motion for mistrial.
La. C. Cr. P. art. 770 provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
[[Image here]]
(3) The failure of the defendant to testify in his own defense; or
[[Image here]]
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court 19shall admonish the jury tó disregard the remark or comfoent but shall not declare a mistriál.
The purpose behind Article 770(3)’s prohibition against prosecutorial comment is to protect defendant’s Fifth Amendment right against self-incrimination by preventing attention being drawn directly or indirectly to the fact that defendant has not testified on his own behalf. State v. Mitchell, 00-1399 (La.02/21/01), 779 So.2d 698; State v. Fullilove, 389 So.2d 1282 (La.1980); State v. Shed, 36,321 (La. App.2d Cir.09/18/02), 828 So.2d 124, writ denied, 02-3123 (La.12/19/03), 861 So.2d 561. To warrant the granting of a mistrial following an indirect comment, on defendant’s failure to testify, the inference must be plain that the remark was intended to focus the jury’s attention on defendant’s not testifying. State v. Mitchell, supra; State v. Reed, 284 So.2d 574 (La.1973); *710 State v. Howard, 262 La. 270, 263 So.2d 32 (1972).
The instant case involves, at best, an indirect reference to defendant’s potential failure to testify. In order to support the granting of a mistrial, the inference must be plain that the remark was intended to focus the jury’s attention on defendant’s not testifying. State v. Mitchell, supra; State v. Reed, supra. First, there is no indication that the district attorney’s intent was focused on drawing the jury’s attention to defendant’s failure to testify. It is clear from the content and context of the district attorney’s comment that she was trying to prevent hearsay testimony from being introduced. We further note that defense counsel had explained defendant’s right not to testify, several times to the jury.
1 mEven if the comments could be construed as an impermissible indirect reference to defendant’s right not to testify, a trial court’s refusal to grant a mistrial is subject to a harmless error review. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Robert, 45,339 (La.App.2d Cir.06/23/10), 42 So.3d 1059, writ denied, 10-1705 (La.01/28/11), 56 So.3d 966. The proper analysis for determining harmless error is whether the jury’s guilty verdict actually rendered in the particular case was surely unattributable to the error. Id.
The admonition to the jury, the evidence of defendant’s guilt, and the complete lack of any evidence of any other source of the trauma to N.L., ■ support the conclusion that the jury’s guilty verdict was surely unattributable to any such error. State v. Robert, supra. The assignments of error on the denial of the- motion for new trial and the denial of a mistrial concerning the prosecutor’s remarks are without merit.

Motion in Limine

The state filed a “Motion in Limine in Reference to Presentation of Evidence,” seeking a ruling preventing defendant from referencing in voir dire or presenting evidence during trial regarding her work history of caring for persons with special needs, foster parent history and/or fostering children with special needs in an effort to show that she did not commit the instant offense because she has not done so in the past. The trial judge noted his discretion and explained that he could rule both ways on this issue. The judge noted that Ms. Green and Ms. Kirkland were on defendant’s witness list and explained that his ruling was that defendant Incould explain what foster care is, the requirements and qualifications for certification, and that defendant met the credentials for fostering children. However, the trial judge stated that he would' disallow any reference by the state to any prior bad acts, or the absence of any prior charges by the defense, related to defendant’s fostering history.
The trial court is granted broad discretion in its evidentiary rulings which will not be disturbed on appeal absent a clear abuse of discretion. Allums v. Parish of Lincoln, 44,304 (La.App.2d Cir.06/10/09), 15 So.3d 1117, writ denied, 09-1938 (La.11/20/09), 25 So.3d 803.
Regarding character evidence of the accused, La. C.E. art. 404 provides, in pertinent part:
A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(1) Character of accused. Evidence of a pertinent trait of his character, such as a moral quality, offered by an *711 accused, or by the prosecution to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the crime with which he is charged, and that character evidence cannot destroy conclusive evidence of guilt.
Testimony as to bad or good general moral character, which formerly was admissible under La. R.S. 15:490, is no longer admissible to attack or to support the credibility of a witness. See La. C.E. art. 608, comment (a).
The trial-judge did not abuse his discretion in granting the state’s motion in li-mine. Under,La. C.E. art. 404, the defense may present character evidence of the accused, but such evidence is limited to moral ^qualities pertinent to the crime. Apparently, the trial judgé was of the opinion that defendant’s alleged success in her one and only prior foster placement was not relevant to the instant charges. However, while the trial judge granted the motion in the instant case, Ms. Green and Ms. Kirkland were allowed to testify, over objection, that defendant was a good employee and that no charges of misconduct had been raised against her. Specifically, Ms. Green provided a glowing character opinion of defendant as a care giver. Defendant has not advised this Court what additional evidence or testimony she would have adduced. This assignment has no merit.

Excessive Sentence

The trial court has wide discretion in imposing a sentence within minimum and maximum limits allowed by the statute; thus, a sentence will not be set aside as excessive unless defendant shows the trial court abused its discretion. State v. Dickson, 48,861 (La.App.2d Cir.09/25/13), 124 So.3d 1193. Under constitutional review, a sentence can be excessive, even when it falls within statutory guidelines, if the punishment is so grossly disproportionate to the severity of the crime that it shocks the sense of justice and serves no purpose other than to inflict pain and suffering. State v. Fatheree, 46,-686 (La.App.2d Cir.11/02/11), 77 So.3d 1047.
Whoever commits the crime of second degree cruelty- to juveniles shall be imprisoned at hard labor for not more than 40 years. La. R.S. 14:93,2.3. .
The trial court adequately considered the sentencing factors and the sentence imposed, 15 years at hard labor, less than half of the maximum |iasentence, is not constitutionally excessive. The judge noted the lack of aggravating factors in terms of no prior criminal activity. Next, the trial court explained the policy of more severe punishments for crimes against the elderly and the very young. , The trial court noted that the circumstantial evidence., was so strong .that there was simply no other explanation for the .severe injuries to, N.L. The judge concluded that it would be “unthinkable” to probate or suspend a sentence based on the nature of this offense and that a lesser sentence would deprecate the seriousness of the crime. The trial court recounted the head injuries and emphasized that the evidence showed repeated strikes to N.L.’s head, which, could well have caused her death. He also stated that he had received 20 letters in support of - defendant asking for leniency and expressing high regards for her both personally and professionally. After thoughtfully considering all of the factors before him, the trial court sentenced defendant to the mid-range term of 15 years at hard labor. This sentence is not so grossly disproportionate to the severity of the crime that it shocks the sense of justice and so that it serves no purpose *712 other than to inflict pain and suffering. State v. Fatheree, supra.

Errors Patent

La. R.S., 14:93.2.3 does not contain any benefit of parole restriction, thus the inclusion of the restriction on benefits renders the sentence illegal. Pursuant to La. C. Or. P. art. 882(A), this Court has the authority to correct an illegal sentence. Accordingly, we hold that defendant’s sentence be amended to delete the restriction on parole.
| ^Finally, a review of the record reveals that defendant was incorrectly advised' that "she has two years from the finality of her conviction to apply for post-conviction relief. The failure'to properly advise defendant is not grounds to vacate the sentence and remand for'resentencing. State v. Cooper, 31,118 (La.App.2d Cir.09/23/98), 718 So.2d 1063, writ denied, 99-0187 (La.05/14/99), 741 So.2d 663. This Court now notifies defendant that she has two years from the date that her conviction and sentence become final under La. C. Cr. P. art. 914 or 922 to file any applicá-tions for post-conviction relief. State v. Parker, 49,009 (La.App.2d Cir.05/15/14), 141 So.3d 839.

Conclusion

For the foregoing reasons, defendant’s conviction is affirmed and her sentence is amended to delete the restriction on parole, probation, and suspension of sentence, and as amended, affirmed.