BROWN, Chief Judge.
LA jury convicted defendant, James Alphonso Parker, of second degree kidnapping and armed robbery with a firearm. The trial court sentenced him to 30 years at hard labor for the armed robbery conviction; an additional five years without the benefit of probation, parole, or suspension of sentence for use of a firearm, to run consecutive to the 30-year armed robbery sentence; and, a concurrent sentence of 20 years at hard labor, two of them to be served without the benefit of probation, parole, or suspension of sentence, for the second degree kidnapping conviction. Defendant has appealed his convictions and sentences. For the following reasons, defendant’s convictions and sentences are affirmed, except that his sentence for armed robbery is amended to delete the five-year enhancement for use of a firearm.

Facts

On the morning of October 30, 2012, while driving to his office at Centenary College, Matthew Jarrod Bailey stopped at the Auto Zone on Kings Highway in Shreveport to buy a new taillight for his ear. Bailey got out of his car and went into the Auto Zone. After making his purchase, Bailey returned to his car and attempted to change the taillight. Unsuccessful in his attempt to fix the light, Bailey got back into his car and responded to a few emails on his cell phone. As he sat in the car with his door partially open, Bailey heard someone walking toward him. Before Bailey could close the door fully, a man pulled it open and pointed a black semi-automatic handgun (a 9mm or .45 caliber) at Bailey. After *843 looking into the man’s face for only a moment, Bailey turned his face forward and held his hands in the air. Bailey assumed that the man was trying to steal his car, but when Bailey tried to get out of the car, the man kicked Bailey’s legs back | ¡.into the car and said, “Don’t fight. Don’t fight.” The man then opened the back door and got in the car behind Bailey, grabbed him by his collar, pressed the end of what Bailey assumed to be the gun into his ribs, and commanded Bailey to drive. Bailey frantically pled with his captor not to hurt him.
As directed by the assailant, Bailey drove away. Bailey told the man he had no cash, so the man told him to stop at the Family Dollar store on Centenary Blvd. The man first said that he wanted Bailey to go into the Family Dollar and use the ATM to withdraw money, but as they neared the store, the man changed his mind because he did not want Bailey to leave the car. The man then directed Bailey to turn around and drive to two banks on Line Avenue. At the Regions Bank, the man instructed Bailey to go to the drive-through ATM and make a withdrawal. The ATM had a $400 withdrawal limit, and Bailey withdrew that amount. During the withdrawal, the man reclined in the back seat to avoid being seen by security cameras. After the first withdrawal, the man directed Bailey across the street to the Chase Bank, which had another outside ATM. The assailant ordered Bailey to request “quick cash” in the amount of $200, which Bailey was able to do.
Through almost all of the car ride, the captor talked to Bailey and asked him questions about things like his family and job. The man also took Bailey’s wallet, looked through it, and read aloud his name and address before throwing the wallet back to the front seat so that Bailey could use his ATM card.
Is After the second withdrawal, the man told Bailey, “I made you a deal. I told you I wouldn’t hurt you if you got me what I needed. And so I’m just going to let you go.” The man then directed Bailey to drive to a park on Coty Street, where the man got out of the car and began walking down the hill by the park. Bailey drove straight to the Centenary police station, where he reported the incident to Corporal Denise Thornton and Detective Jack Miller.
On the same morning, Michelle Wells and her father were at the Auto Zone on Kings Highway to get some oil for her truck. When they arrived, Wells’ father stayed in his car while Wells went into the store to buy the oil. As Wells stood waiting to pay for her purchase, she heard her father outside blowing his car horn. As she looked out of the store window, she saw a man standing next to a green Jeep sport utility vehicle “tussling” with a white man. The Jeep quickly departed the parking lot. After realizing what had occurred, Wells called the police.
Michelle Wells identified defendant as the person whom she saw standing next to the green Jeep and fighting with its owner. She recognized him at the Auto Zone because she had seen him a day or two previously, knocking on people’s car windows at the intersection of Kings Highway and Youree Drive, and later that day as he was approaching cars in the parking lot of the Super 1 Foods grocery store. When Wells saw defendant at Kings and Youree, the distance between them was about five to ten feet. At Super 1 Foods, Wells saw him close up, and he looked directly at her before walking to the next truck in the parking lot.
|4In a meeting with Detective Miller after the crime, Wells selected defendant’s *844 picture from a six-person photographic lineup. Wells was also able to identify in court Matthew Bailey as the white man who drove the Jeep. Wells testified that she was “positive” that defendant was the man whom she saw at the Auto Zone. Wells stated that, other than these three encounters, she had never seen or met defendant before.
On cross-examination Wells testified that she did not know whether the assailant wore a hat or gloves, and she did not see a firearm. She testified that she had told police that he wore denim blue jean overalls and a blue jean jacket, and was not wearing glasses. Wells admitted that she initially told the police that her last name was Johnson when she talked to them because she did not want defendant to be able to find her. She explained that Johnson had once been her name, and had merely been changed by marriage.
Bailey stated at trial that he had not been able to look prolongedly at his captor. When the man first approached him and opened his door, Bailey looked into his face for only a moment before seeing the gun and then looking forward. After the man entered the car, he held Bailey’s shirt collar from behind for most of the ride and continued to hold something at Bailey’s ribs (the object which Bailey assumed was the gun). The man told Bailey not to look at his face. Nonetheless, Bailey was able to see that the assailant was a black male in his late forties or fifties, that he was five feet and ten inches to six feet in height and taller than Bailey, who is five feet and eight and one-half inches tall, that he was “bigger” though neither fat nor skinny, and that he had a little facial hair. Bailey also saw the man’s clothing, |fiwhich he described as a blue jacket, black pants, black boots, a black knit hat, and black gloves.
Two or three days after the incident, Bailey met with Detective Miller of the Shreveport Police Department. Based on the descriptions given by Bailey and Wells, Corporal Javon Tyler, a community liaison officer for District Five, came across defendant later the same day as the incident. After defendant was taken into custody, Detective Miller prepared a photographic lineup which included defendant’s picture. Although Detective Miller told Bailey that the lineup might not contain the assailant’s picture, Bailey chose defendant’s picture and said that he was “78%” sure that this was the man who kidnapped and robbed him. Bailey testified that he was in the courtroom the day before the trial began, and he saw defendant in the courtroom at that time. When he heard defendant speak in court on that day, Bailey was certain that defendant was the man who kidnapped and robbed him. At the time of his testimony at trial, based on everything, Bailey was “100% sure” that defendant was his assailant.
On cross-examination, Bailey stated that he only saw the perpetrator’s face for a split second. Because he was in the military, he was able to tell that the gun was a large, semi-automatic firearm. The only time that he saw the gun was in that instant when the man was outside of his car.
Detective Jack Miller of the Shreveport Police Department testified. Detective Miller testified that he had spoken to Michelle Wells after the incident. Wells told him that she also had seen defendant around the Salvation Army shop on Stoner Avenue. According to Miller, when he showed Bailey the six-person photographic lineup, Bailey picked out ¡(¡defendant and said that he was about 80% sure that he was the perpetrator. When Miller asked Michelle Wells and her father to look at the lineup, the father was unable to select *845 a photo, but Wells selected the photograph of defendant. Detective Miller retrieved security camera pictures from the banks at which the ATMs were visited during the crime, but the pictures did not show the contents of the back seat of Bailey’s car because of the tint on the rear windows. The police department performed a crime scene investigation of Bailey’s car, but neither the fingerprints nor the DNA samples which police collected yielded useful results.
After the state rested, defendant took the witness stand to testify. Defendant stated that around the time of the crime he was homeless, and that he slept on the porch of the bingo hall near the Super 1 Foods and the “Hong Kong.” He said that he came back to Louisiana from Kansas City nine months before trial to see his girlfriend in Bossier City. When he arrived and learned that she no longer cared to see him, that’s when he became homeless. Defendant stated that, because of his transient way of life, he did not know his location at the time of the crime, but he guessed that he had been either on a city bus, on the porch of the bingo hall or by Wal-Mart. The only two people who he thought might be able to attest to his whereabouts would be the security guard and the nighttime janitor at the bingo hall. Defendant stated that he was a professional panhandler and that he gambled on a daily basis. Defendant put great emphasis on the fact that the state had no gun, no fingerprints, and no video recordings to show that he committed the crimes with which he was charged.
17Regarding his identifications by Bailey and Wells, defendant said that he had come in contact with Bailey while panhandling at a Wendy’s restaurant parking lot. One day after gambling at “What’s on Tap?,” which is near the Wendy’s restaurant, defendant asked Bailey for some change. According to- defendant, Bailey said to him, “You look like the guy that just robbed my wife. Did you just rob my wife?” Defendant stated that he had never seen Bailey before that, and that on that day Bailey drove a gray Chrysler car.
Defendant stated that Michelle Wells looked familiar to him, but that he did not remember ever meeting her. He explained that she could identify him because she had probably seen him panhandling in the area like she said. He also stated that he had worn glasses before going to jail, where he lost them, apparently implying that this fact tended to show that the •witnesses had misidentified him. He asserted that Wells’ claim to have seen him commit a crime arose from a “malicious intent” which she developed against him when she saw him panhandling.
On cross-examination, defendant admitted that he had a prior theft conviction, but stated that it occurred in the 1980s and it was for a fishing pole. Defendant also admitted to a 2007 Nebraska conviction for possession of crack cocaine, for which he received two years of parole. He explained that he had been addicted to crack cocaine for 17 years, and that he supported his habit with his monthly Social Security check and by panhandling. He was unsure whether he had smoked crack cocaine on the day of the crime. According to defendant, he has always been able to support himself, and he has never had to rob “nobody for nothing.” Defendant also 1 ^testified that he was being set up and sold out by his public defender and railroaded by the state.
The state called Matthew Bailey on rebuttal. Bailey testified that he had never owned a gray Chrysler, he had never seen defendant before October 30, 2012, his wife had never been robbed or attacked, and he had never met Michelle Wells.
*846 The jury returned a verdict of guilty as charged of armed robbery with a firearm and guilty as charged of second degree kidnapping
Thereafter, the defense submitted a motion in arrest of judgment, a motion for new trial, and a motion for post-verdict judgment of acquittal.
The trial court denied defendant’s motions. Defendant waived sentencing delays. The court then noted that the statutory range for armed robbery was 10 to 99 years at hard labor and sentenced the defendant to 30 years at hard labor. For use of a firearm in the robbery, the court sentenced defendant under La. R.S. 14:64.3 to an extra five years without benefit of parole, probation, or suspension of sentence. For the second degree kidnapping, the court sentenced defendant to 20 years at hard labor, to be served concurrent to the robbery sentence, with two of the years to be served without the benefit of parole, probation, or suspension of sentence. The trial court gave no explanation for the sentences imposed and cited no sentencing factors.
Defendant’s motion to reconsider excessive sentence was denied. Defendant has appealed, urging five assignments of error.

Discussion

Sufficiency of the Evidence

| gAccording to defendant, the evidence was insufficient to support his conviction for armed robbery and second degree kidnapping. Specifically, defendant emphasizes that after viewing the photo array, Bailey told Detective Miller that he was only 78% sure that defendant’s photograph matched the face of his assailant. Defense counsel notes Bailey’s testimony that he was only able to view the assailant’s face for a moment because he was too frightened to look for longer than that, and at trial Bailey’s testimony was:
And for a long time I just wondered — I mean, after — after they arrested him and after I had identified him and even hearing that — you know, even hearing that the other witness identified him, I still — I still would see people on the street sometimes and — and think, well, you know, well, is that the guy or — I mean, I just — I was just still scared to the point where I — you know, I was still worried that maybe they didn’t have the right guy; maybe he was still out there.
Regarding Michelle Wells’ identification of defendant, defense counsel argues that Wells recognized defendant from the two times that she saw him panhandling before the crime, and that her ability to identify defendant as the assailant is weak because she wasn’t really paying attention to the fight between the assailant and Bailey in the Auto Zone parking lot.
Defendant also emphasizes that although he was arrested on the day of the crime, police found no money on him, nor did they ever find the gun allegedly used in the crime, the money allegedly stolen, fingerprints, DNA evidence, or any video recordings depicting defendant.
Sufficiency of the evidence to sustain a state criminal conviction implicates the due process clause of the Fourteenth Amendment. Due process requires that the state prove beyond a reasonable doubt every 110essential element necessary to constitute the crime charged. Thus, a claim that evidence is insufficient to support a conviction as a matter of due process depends on whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. The defendant must be acquitted if the evidence is insufficient to support the jury’s findings on each element of the of *847 fense, as a conviction based on legally insufficient evidence on any element of the charged offense constitutes a denial of due process. Jackson v. Virginia, 448 U.S. 807, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.01/14/09), 1 So.3d 833, writ denied, 90-0310 (La.11/06/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
In the instant case, two witnesses testified that defendant was the man who fought with Matthew Bailey in the parking lot of the Auto Zone. The victim, Matthew Bailey, testified that defendant was the man who kidnapped and robbed him. Both Bailey and Wells picked defendant out of a six-man photographic lineup. Although Bailey testified that he was not fully certain that defendant was his assailant until he saw and heard defendant in court, | nBailey was nonetheless certain of defendant’s identity at trial, recognizing defendant by both his appearance and his voiee.
What defendant appears to claim is that Bailey’s and Wells’ identification of him as the assailant was not credible. Both witnesses had an opportunity to see the criminal at the time of the crime, the degree of attention was great, the accuracy of the witnesses’ prior descriptions was high, as they were largely the same, the two witnesses separately chose the same man from the photographic lineup, and their level of certainty was high. Bailey was 78% sure of his identification when looking at a photograph and 100% sure in court, while Wells was entirely sure defendant was Bailey’s attacker both when looking at defendant in the photo lineup and in court. The length of time between the crime and the confrontation is very short: apparently both Bailey and Wells viewed the photographic lineup only two or three days after the crime, and the trial occurred only about six months after the offense. According to these factors, the identification of defendant by Bailey and Wells was reliable. See State v. Kemp, 39,358 (La.App.2d Cir.03/11/05), 896 So.2d 349, unit denied, 05-0937 (La.12/09/05), 916 So.2d 1052.
Viewing the evidence in the light most favorable to the prosecution, we find that the evidence was sufficient for a rational jury to find guilt proven beyond a reasonable doubt. This assignment of error is without merit.

Admissibility of Photo Lineup

In this assignment of error, defendant argues that the photographic lineup was unduly suggestive because defendant’s head was larger than the heads of the other five people pictured. Defendant argues that the 112suggestiveness of the lineup created such a likelihood of misidentifi-cation that reversal of the conviction is necessary.
A hearing on defendant’s motion to suppress photo identification and in court identification was held on May 2, 2013. At the hearing, Detective Jack Miller testified that he had received defendant’s photograph from the jail where he was being held, and that he compiled the lineup using the AEIS computer system, which randomly picks photographs of persons with physical qualities identified by the compiler of the lineup. Det. Miller testified that these pictures are often taken from differ *848 ent distances, and he has no way of adjusting the sizes of the people depicted in the pictures.
In seeking to suppress an identification, the defendant must prove the procedure used was suggestive and that the totality of the circumstances presented a substantial likelihood of misidentification. State v. Martin, 595 So.2d 592 (La.1992).
Photographs used in a lineup are suggestive if they display the defendant so singularly that the witness’s attention is unduly focused on the defendant. State v. Smith, 430 So.2d 81 (La.1988). It is not required that each person whose photograph is used in the lineup have the exact physical characteristics as the defendant. What is required is sufficient resemblance to reasonably test identification. State v. Smith, supra; State v. Davis, 27,961 (La.App.2d Cir.04/08/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12.
In the photographic lineup shown to both Bailey and Wells, defendant’s head is bigger than the heads in the other pictures. However, it is not that much bigger than the head of the picture on the bottom left corner |1sof the page. Although the larger size of a picture might tend to focus a witness’s attention upon it, the difference in this case is so small that the slightly greater size of defendant’s picture is very unlikely to have weighed upon the witnesses’ identification. We note that, regarding the photo lineup, defendant remarked during his testimony that the picture of the man directly above his looked enough like him that he could have been his brother. This assignment of error is without merit.

State’s Use of Peremptory Challenges

In his third assignment of error, defendant argues that the state wrongly used its peremptory challenges to strike black jurors. The defense made the same argument in the trial court when it moved orally to quash the jury panel at the end of voir dire. In the estimate of defendant’s trial counsel, half of the initial venire jurors were white and half were black. The state then used nine of its ten peremptory strikes against black jurors, so that only a fourth of the final jury, three members out of twelve, were black. The court found that the fact that the state used nine of its ten strikes against black venire jurors did not in itself create a prima facie case; even so, it ordered that the parties proceed through the list of challenges one by one. Defense counsel identified the specific strikes that it contested, and the state presented its race-neutral reasons for the strikes. The court then analyzed each juror individually and concluded that “the prosecutor did not demonstrate a pattern of challenging these Jurors only on the basis of their race.”
It is well settled that the use of peremptory challenges based solely on a juror’s race is prohibited. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 141712, 90 L.Ed.2d 69 (1986); La. C. Cr. P. art. 795. In State v. Draughn, 05-1825 (La.01/17/07), 950 So.2d 583, 600, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007), the proper reviewing process for a Batson claim, as recently described by the U.S. Supreme Court in Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), was set forth as follows:
A defendant’s Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. 476 U.S. at 96-97, 106 S.Ct. 1712, 90 L.Ed.2d 69. Second, if the showing is made, the burden shifts *849 to the prosecutor to present a race-neutral explanation for striking the juror in question. Id., at 97-98, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Although the prosecutor must present a comprehensible reason, “[t]he second step of this process does not demand an explanation that is persuasive, or even plausible”; so long as the reason is not inherently discriminatory, it suffices. Purkett v. Elem, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 884 (1995) (per curiam). Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, supra, at 98, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69; Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 2331-2332, 162 L.Ed.2d 196 (2005). This final step involves evaluating “the persuasiveness of the justification” proffered by the prosecutor, but “the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.” Purkett, supra, at 768, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834.
A reviewing court owes the district judge’s evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395 (1991); Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724.
In State v. Green, 94-0887 (La.05/22/95), 655 So.2d 272, the Louisiana Supreme Court held that the sole focus of the Bat-son inquiry is the intent of the prosecutor at the time he exercised his peremptory strikes. 15See also State v. Juniors, 03-2425 (La.06/29/05), 915 So.2d 291, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006). The trial court plays a unique role in the dynamics of a voir dire, for it is the court that observes firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. Id.; State v. Myers, 99-1803 (La.04/11/00), 761 So.2d 498; State v. Jones, 42,531 (La.App.2d Cir.11/07/07), 968 So.2d 1247; State v. Coleman, 41,764 (La.App.2d Cir.01/24/07), 949 So.2d 570, writ denied, 07-0459 (La.10/12/07), 965 So.2d 398.
According to the analysis set forth in State v. Draughn, supra, the trial court should first determine whether the defendant has made a prima facie showing of race-based peremptory challenges. If the prima facie showing exists, then the state must provide race-neutral reasons for each challenge. It is then that the trial court must then determine whether the state has carried its burden.
In this case, the trial court found that defendant had not made a prima facie showing of race-based peremptory challenges, but nonetheless moved to step two of the Draughn inquiry and allowed defendant to present individual arguments that each of the challenges exercised by the prosecutor had a racial basis.
Of the nine contested peremptory challenges, seven were challenges of venire jurors who either had been a victim of a crime, had relatives who had been victims, or had relatives who were convicted criminals. Four potential |1fijurors said that they were unhappy with the state’s treatment of the crimes involving them or their family members. Two potential jurors were challenged for their inability to pay attention or for flippant responses and an inappropriate attitude toward the gravity of these proceedings.
The state gave race neutral reasons for all of the contested peremptory strikes. *850 All of them are facially persuasive, and all were analyzed and found to be non-racially motivated by the trial court. The record shows no manifest prosecutorial intent to strike jurors because of their race. This assignment is without merit.
| itDenial of Request for Mistrial
Defendant argues that the trial court erred in refusing to grant a mistrial after the state solicited testimony about defendant’s post-arrest silence in the presence of the jury. At trial, the following colloquy occurred between the prosecutor, defense counsel, trial judge, and Detective Jack Miller during the state’s direct examination of Detective Miller:
Prosecutor: Did you subsequently arrest the Defendant for the charges of armed robbery and kidnapping?
Det. Miller: Yes, I did do charge sheets on him for the armed robbery and kidnapping.
Prosecutor: Okay. Did you speak with the defendant?
Defense Counsel: Objection.
The Court: What is your objection?
Defense Counsel: Fifth Amendment.
Prosecutor: We’re talking about an investigation here. Am I to get the Detective to lie and say that he didn’t attempt to talk to somebody? Pm unsure.
The Court: It’s not a valid objection. I overrule it. Move on.
Prosecutor: Okay.
Prosecutor: Did [defendant] make a statement to you?
Det. Miller: He did not. I went to the jail to talk to him, and he just advised he would like to speak to his Attorney. That ended the interview.
At the end of Detective Miller’s testimony, defense counsel moved for a mistrial. Although the judge denied the mistrial, when the jury returned from a short recess, the judge nonetheless admonished the jury to disregard the testimony about defendant’s post-arrest silence.
The Fifth Amendment to the U.S. Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. To give full effect to the Fifth Amendment’s protection, the Supreme Court has held that the Fifth Amendment prohibits comments by the prosecution on the defendant’s post-arrest silence. Griffin v. California, 18380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The general rule is that a defendant’s silence cannot be used against him as evidence of guilt. Griffin, supra; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Under La. C. Cr. P. art. 771, when the prosecutor or a witness makes a reference to a defendant’s post-arrest silence, the trial court is required, upon the request of the defendant or the state, to promptly admonish the jury. State v. Washington, 46,265 (La.App.2d Cir.08/17/11), 72 So.3d 422. In such cases where the trial court is satisfied that an admonition is not sufficient to assure the defendant of a fair trial, the court may grant a mistrial upon the motion of the defendant. La. C. Cr. P. art. 771.
A mistrial is a drastic remedy to be invoked only when defendant suffers such substantial prejudice that he is deprived of any reasonable expectation of a fair trial. State v. Higginbotham, 46,975 (La.App.2d Cir.04/25/12), 122 So.3d 1, writ denied, 12-1718 (La.05/24/13), 116 So.3d 658. The decision to grant or deny a mistrial lies within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. Id. Likewise, the determination of whether an admonition will adequately cure any prejudice and assure a fair trial lies within the *851 trial court’s discretion. Id.; State v. Jeffers, 623 So.2d 882 (La.App. 2d Cir.1993).
A brief reference to a defendant’s post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted, the proof of guilt is strong, and the prosecution made no use of the silence for impeachment purposes. State v. Jones, 40,652 (La.App.2d Cir.01/25/06), 19920 So.2d 941, writ denied, 06-1164 (La.12/15/06), 944 So.2d 1278; State v. Mays, 612 So.2d 1040 (La.App. 2d Cir.1993), writ denied, 619 So.2d 576 (La.1993).
The state specifically presented the information that defendant exercised his right to remain silent and asked for an attorney. The trial judge allowed this information. This was clearly wrong. However, the trial judge, after a break, did, without a request from the prosecutor or defense counsel, admonish the jury to disregard the question and answer. The testimony about defendant’s refusal to speak to Det. Miller was general and brief. See State v. George, 95-0110 (La.10/16/95), 661 So.2d 975; State v. Kersey, 406 So.2d 555 (La.1981). Furthermore, defendant’s post-arrest silence was not mentioned again by any other witness or by the prosecutor in his closing argument. The trial as a whole was conducted fairly. We find that the prosecutor’s questions, while clearly improper, were unlikely to have been a factor in the jury’s decision to convict defendant, where two separate eyewitnesses identified with certainty defendant as the kidnapper and robber. The jury’s finding of guilt was surely unattributable to the error. This assignment lacks merit.
| ^Excessive Sentence
We will first address defendant’s argument that the trial court imposed an extra five years of imprisonment under La. R.S. 14:64.3 because defendant committed the robbery with a firearm. The state agrees with defendant that the five-year sentence for use of a firearm during a robbery was wrongly imposed based upon the state’s failure to accuse defendant of this specific crime in the bill of information or the bill of particulars. We will therefore amend defendant’s sentence to delete the extra five-year term of imprisonment for use of a firearm in an armed robbery. See State v. Willis, 45,857 (La.App.2d Cir.12/15/10), 56 So.3d 362, writ denied, 11-0150 (La.06/17/11), 63 So.3d 1034.
Defendant asserts that his sentences are excessive. Defendant cites the trial court’s failure to state its consideration of any of the sentencing factors of La. C. Cr. P. art. 894.1.
When the trial judge sentenced defendant, the only explanation that she gave was the statutory range for the sentences. The court did not name any of the La. C. Cr. P. art. 894.1 factors or list any qualities of the offense or the offender to illustrate the reason for the length of sentences given. This failure is a violation of La. C. Cr. P. art. 894.1(C), which requires a sentencing judge to “state for the record the considerations taken into account and the factual basis therefor in imposing sentence.”
In State v. Landos, 419 So.2d 475, 477-78 (La.1982), the Louisiana Supreme Court held:
[T]he trial judge’s failure to comply with Article 894.1 does not automatically render a sentence invalid. This court has held that although Article 894.1 provides useful guidelines for the | ⅞1 determination of the nature and length of a sentence, compliance with its provisions is not an end in itself. State v. Wimberly, 414 So.2d 666 (La.1982). Article 894.1 is intended to provide an impartial set of *852 guidelines within which the trial judge’s sentencing discretion may be exercised. State v. Price, 408 So.2d 660 (La.1981); State v. Douglas, 389 So.2d 1263 (La.1980). Compliance with Article 894.1 further provides a record which is detailed enough to allow for a reasoned review of allegedly excessive sentences. The articulation of the factual basis for a sentence is the goal of Article 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed this court has held that remand is unnecessary, even where there has not been full compliance with Article 894.1. (Emphasis added).
A sentence violates La. Const, art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Lobato, 603 So.2d 739 (La.1992). A sentence is deemed grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribution to acceptable penal goals. State v. Guzman, 99-1753 (La.5/16/00), 769 So.2d 1158.
As the Louisiana Supreme Court stated in State v. Landos, supra, the failure to state the factual basis for a sentence is not grounds for reversal where the basis is apparent from the record.
The trial court heard the evidence at trial and implicitly considered the information presented. We note that defendant waived any sentencing delays. Several of the factors from La. C. Cr. P. art. 894.1 apply: defendant received something of value by committing the crime; defendant used threats of or actual violence; and, defendant used a dangerous weapon in the | ^commission of the offense. Also presented was defendant’s absence of a violent criminal history; his status as a homeless, drug-addicted, possibly disabled panhandler; and his age of 50 years. Defendant’s only prior convictions mentioned in the record, an old theft conviction and possession of cocaine, are non-violent offenses.
La. R.S. 14:64 provides that the sentence for armed robbery is imprisonment at hard labor for not less than 10 years nor more than 99 years, without the benefit of parole, probation, or suspension. Although not a light term, defendant’s 30-year robbery sentence is 69 years shorter than the statutory maximum and much closer to the lowest allowable sentence than to the highest. Furthermore, the robbery sentence encompasses the concurrent second degree kidnapping sentence of 20 years, which itself is only half of the statutory maximum of 40 years. See La. R.S. 14:44.1. The facts present in the record support the sentences imposed, which we find neither to constitute an abuse of the trial court’s sentencing discretion, nor to be excessive by constitutional standards. The fifth assignment of error fails in this regard.

Error Patent Review

Our error patent review reveals three such errors. First, defendant’s robbery sentence should have been ordered to be served without benefit of probation, parole or suspension of sentence. La. R.S. 14:64. However, the trial court’s failure to state that the sentence for armed robbery is to be served without benefit will be corrected automatically by operation of La. R.S. 15:301.1. State v. Hampton, 38,017 (La.App.2d Cir.1/28/04), 865 So.2d 284, writs denied, 04-0834 (La.03/11/05), 896 So.2d 57.
*853 ^Second, the bill of information charged defendant with second degree kidnapping under La. R.S. 14:44.2. Second degree kidnapping is actually La. R.S. 14:44.1, while La. R.S. 14:44.2 is aggravated kidnapping of a child. The error, however, is harmless; the bill of information charges “Second Degree Kidnapping” as Count One, and nothing else in the record gives any cause for doubt that second degree kidnapping was the offense charged. The error, not having been objected to, has been waived. La. C. Cr. P. art. 585(A)(2).
Finally, the trial court did not inform defendant of the two-year delay for the filing of post-conviction relief as required by La. C. Cr. P. art. 930.8(C). This court hereby notifies defendant that he has two years from the date that his convictions and sentences have become final under La. C. Cr. P. Art. 914 or 922 to file any applications for post-conviction relief. State v. McNeil, 42,231 (La.App.2d Cir.06/20/07), 961 So.2d 554.

Conclusion

For the foregoing reasons, defendant’s convictions and sentences are affirmed except that the armed robbery sentence is amended to delete the extra five years for use of a firearm in an armed robbery. CONVICTIONS AFFIRMED; SENTENCE AMENDED, AND AS AMENDED, AFFIRMED.