PITMAN, J.
| defendant Dalduran J. Brandon was convicted of second degree murder and sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. He now appeals, arguing that the evidence was insufficient to support his conviction. For the following reasons, we affirm.

FACTS'

In the early morning hours of February 18, 2014, Defendant, Martavia King and Malcolm Hall broke into the residence of 79-year-old Nathaniel Cash in Gloster, Louisiana. A struggle ensued and Defendant held Mr. Cash in a chokehold while Hall wrestled a gun from him and tied his hands behind.his back. During the struggle, Mr. Cash’s spine was fractured. The men ransacked the house and left with the gun and some coins. Due to the stress of the home invasion, Mr. Cash suffered a heart attack and died.
Defendant was ultimately charged by an amended bill of indictment with second degree murder.[1] The jury trial was conducted on September 14-17, 2015. The following facts were gleaned from the witnesses’ testimony:
Nancy Clark, who is Mr. Cash’s next-door neighbor, testified that, on February 18, 2014, as she left for work at- about 6:00 a.m., she noticed that a door to the victim’s house was open. She attempted to call Mr. Cash on the telephone; but, when he did not answer, she . called his daughter, Patricia Smith, and told her about the open door to her father’s house.
|2Ms. Smith testified that she is the victim’s daughter and that .Ms. Clark called her on the morning of February 18, 2014, and told her that the door to her father’s house was open. She attempted to call him three times, but he did not .answer. *142 She then went oyér to his home about 8:45 a.m., entering through the laundry room door and through to the living room. Nothing appeared to be out of place; however, when she went to the middle bedroom, she observed that the house had been ransacked. The mattress 'was thrown off the bed, the television was on the floor-and all of the furniture drawers were open. She found the victim lying face up on the floor near the bed of the back bedroom. He was wearing white boxer shorts and a white T-shirt. She left the house, went next door 'and called 911. She also: testified that her father was -79 years old at the time of his death.
Deputy Jacques Burton of the DeSoto Parish Sheriffs Office was the first officer on the scene. ' He testified that, when he arrived at the victim’s .house, he noticed that a: window in the carport was broken and a door was open. He noted that the path from the bathroom area, where the broken window and open door were located, through the living room, was not in disarray; however, the bedrooms, located in the back of the house, had been ransacked. He stated that the victim was found in the back bedroom, and it appeared that his handswere tied behind his back and a black rope was draped around his thigh area. .
Sergeant- Adam Jones of the DeSoto Parish Sheriffs Office testified that he was the crime scene investigator and that he took multiple photographs of the scene, which he identified as the exterior of the house; lathe carport area with the open door and broken window with broken glass on the floor. inside; the interior of the house where everything was in place; and the two bedrooms, which had been ransacked. He identified the photographs of the victim which showed him lying on the floor on the side of the bed with his hands bound behind his back with a black nylon rope. There was- a 15-inch metal “rod bracket” located on the floor next to the victim. He further testified that the metal rod had two holes in one portion and was curved at a 90-degree angle at one end. This metal bar .and the black rope which tied the victim’s hands were admitted into evidence..
Sgt. Jones also testified that he took photographs of Malcolm Hall, who was later identified as a suspect. The photos show that Hall, who was shirtless, had cuts on his back and right arm, which were bonsistent with someone -who might have climbed through the broken window. DNA swabs.were taken from items and locations in the home. Photos were taken of Hall’s parents’ house, which is next door to the victim’s house. He stated that a Sgt. Parker, who was assisting in the investigation, had received information that Defendant and' other suspects had been hanging out and drinking in the intersection directly across the street from the victim’s house on the evening of the crime and that photos were taken of that intersection. He also photographed a white Buick Lucerne which belonged to Defendant’s mother, Vera Young, and in which Defendant had been seen the night of the crime.
Tiffany Stanford, the victim’s granddaughter, testified that she lived on Glen Road, “right up the street,” within a half mile from the victim, and 14that, on February 17, 2014, she saw a white car, the Buick Lucerne, at the end of Glen Road around 11:30 p.m. to 12:00 a.m. She stated that there were three men in the car and that she had -recognized Hall, but'did not recognize the other men.
Jacolbey Pouncy, the victim’s nephew, testified that he lived in the area by the victim’s, house and knew Defendant from school. He stated that he saw Defendant in a white car, the Buick Lucerne, in the *143 neighborhood on February 17, 2014. He also saw the white car that night, around 11:00 to 11:30 p.m., parked in a driveway down the street from the victim’s house.
Martavia King, who is a codefendant in this case, pled guilty to manslaughter and was sentenced to '40 years at hard labor. As part of the plea bargain agreement, he agreed to testify against Defendant.
King testified that, in the early evening hours of February 17, 2014, Defendant picked him up from his house in a white Buick. They went to Kickapoo Corner Store to get cigarettes and then to: Hall’s house so Hall could cut their hair. After the haircuts, the three men drove ■ to Shreveport to get some cocaine. King stated that first Hall, and then he, snorted the cocaine. They ran out of cocaine and made several trips to purchase more. Defendant did not have money to buy the cocaine, but he participated in snorting it.
King further testified that, by the time they returned to Gloster, it was late evening. On their way back to Gloster, Hall asked them if they wanted to “hit a lick,” which he explained meant to rob someone. He stated that Defendant agreed to the suggestion that they rob Mr. Nathanial’s (Cash’s) Rhouse. The plan was that someone (Hall) would knock on the door, someone (Defendant) would hold him down and someone would search the house.
King also testified that they parked the ear, walked to Mr. Cash’s house and then checked the shed behind his house. Hall took the black nylon rope-and the metal bar from that shed. He stated that they walked around the house and that Hall and Defendant knocked on doors and windows. When nobody answered, Hall used the metal bar to break a window in the carport and then crawled through .the window into the house. He and Defendant followed.
King further testified" that, when he got to the bedroom in the back of the house, he saw Hall wrestling with the victim -in an attempt to get a gun out of his hand, while Defendant had the victim in a chokehold from behind. He stated that Hall and Defendant were yelling, “Where the money at.” He told them to stop; but, when Hall was able to wrest the gun from the victim, he pointed the gun at him, ordering him to search the house, He went into the bathroom and began opening the cabinets. He stated that he did not see anybody hit the victim. When he came out of the bathroom, the victim was on the floor with his hands tied up. He testified that the victim struggled for air from the time he was placed in the chokehold until the time they left the house.
King also testified that they searched the bedrooms and that Defendant tried to take a mounted television off the wall, but it fell and broke, so he left it on the floor. He stated that Defendant and Hall took |ficoins from a jewelry box they found in the bedroom. After they left the house and got back to the car, Hall gave Defendant the victim’s gun and Defendant put it under the driver’s seat of the car. He never saw the gun again.
Sergeant Billy Locke, investigator for the Mansfield Police Department and the Chief Deputy for the DeSoto Parish Coroner’s Office, testified that he responded to the victim’s house in his capacity as the Chief Deputy Coroner and pronounced the victim deceased. He identified photos that he took of the victim at the scene, showing the victim lying face up on the floor, with his hands behind his back and a black rope wrapped around his thigh. The black rope was" also wrapped around the victim’s wrists, binding-his hands together. The photos showed bruises on the victim’s legs, knees and right.elbow, which could have been related to the incident. Doctor Long *144 Jin, an expert in forensic pathology, testified regarding his autopsy of the victim, stating that the cause of death was “stress induced exacerbation of atherosclerotic/hy-pertensive cardiovascular disease due to a home invasion.” The autopsy showed that the victim had coronary disease, that he had suffered a previous cardiac infarction with damage to his heart and that his heart was twice the size of a normal heart. He stated that, because the victim’s heart was so enlarged, it required more oxygen and more blood supply, especially during the stress of the home invasion, which stress caused the victim’s cardiac arrhythmia and death.
Dr. Jin also testified that the victim suffered blunt force injuries, meaning that there was some struggle between the perpetrator and the |7victim before his death. He noted the victim had abrasions on his hands, arms and wrists, both of his knees, his head and on the side of his tongue, which may have been caused when he was choked. He stated that the victim’s C-7 vertebra, which is at the base of the neck, was fractured, and that such an injury is consistent with being choked from behind.
Dr. Jeffery Evans, a general practitioner from Mansfield, Louisiana, testified that, although he did not personally know the victim, who was a patient of a Dr. Dillard, who had recently died, he reviewed the victim’s medical records at the request of the district attorney’s office. He stated that the victim had arthritis; a prior history of prostate cancer; hypothyroidism; vascular disease; and that he had suffered a stroke in 2010, but had recovered well. He also stated that he had reviewed the autopsy report and agreed with Dr. Jin as to the cause of the victim’s death.
■ Vera Young, Defendant’s mother, testified that she owns a white Buick Lucerne and that, on the night of February 17, 2014, she woke up and discovered that her car and her son were not at the house. She woke up later and observed that both were back home.
Detective Shawn Parker of the De Soto Parish Sheriffs Office testified regarding his investigation in the ease. He stated that, shortly after he responded to the scene, a man named Terrence Hamilton, who had been in the crowd around the victim’s house, told him that the night before there had been a white car parked on the street close to the victim’s house and that it was occupied by Defendant, King and Hall. Several hours later, Mr. Hamilton brought Defendant to the scene to talk to Det. Parker. At that |stime, Defendant provided inconsistent information regarding his whereabouts the night before, so Det. Parker asked him to come to the Sheriffs office for further questioning. Defendant agreed and eventually provided a total of three recorded statements. At each interview, Defendant was read his Miranda warning, and he signed waivers of his rights. At the first interview, conducted on February 18, 2014, at 2:00 p.m., Defendant denied any knowledge or involvement in the incident.
In the second interview, conducted at 9:00 p.m. that same day, Defendant initially denied any involvement; but, when confronted with statements made by King and Hall, he admitted that all three of them broke into the victim’s house, entering through a window that Hall had broken. Defendant stated that, while they were in the house, Hall was wrestling with the victim and asking him where the money was, but he and Kang did not touch the victim. He stated that Hall had a gun in the house, which he assumed was taken from the victim. He admitted that he went through drawers, claimed that he did not take anything from the house, but *145 stated that King took coins from a jewelry box. Based on this statement, he was detained.
The third interview was conducted the next morning and Det. Parker informed Defendant that he had been told that Defendant left the victim’s house with the gun and placed it under the driver’s seat of the Buick. Defendant denied leaving the house with the gun and stated that Hall was the last person to have the gun.
|flDet. Parker also testified regarding a letter Defendant wrote to the district attorney in which he admitted that he committed the burglary, but that he “had no part in the victim, Mr. Cash, being tied up and ending up with a fractured vertebrae.”
Dr. Candace Jones, an expert in forensic DNA analysis at the North Louisiana Crime Lab, testified that she conducted DNA testing on three swabs from the black rope found around the victim’s wrists. The DNA profile obtained from one of the swabs from the rope was consistent with being a mixture of DNA from the victim and. Hall. Defendant and King were excluded as possible donors of the DNA. The other two swabs from the rope contained only.the victim’s DNA.
King testified for the defense regarding inconsistencies between his trial testimony and his prior statements to police about whether he knocked on the door of the victim’s house and the order the men went through the window to get into the house. He admitted that he had lied to the police in the initial statement because he was trying to stay out of trouble.
Defendant took the stand and testified that, on February 17, 2014, he drove his mother’s white Buick to pick up King and they went to -Kickapoo Corner Store and then to Hall’s house for a haircut. He stated that Hall asked them if they wanted to “hit a lick” and he agreed because there was money in the victim’s house. He further stated that Hall’s plan was to tie up the victim, so Hall got a rope from outside the victim’s house. Hall broke the window with a metal rod and he and King-followed him into the house. He testified that, when they got into the house, he went into one of the |inbedrooms and began going through the drawers. He tried to pull a television off the wall, but it fell and broke. He heard Hall wrestling with the victim in another bedroom and went through that bedroom into the bathroom where King was going through the drawers. He heard Hall hitting the victim with a gun. Hall asked King for assistance; and, when King refused, Hall went into the bedroom. He stated that he asked Hall what he was doing and told Hall to give him the gun. Hall gave him the gun and then they left the house. He stated that he put the gun under the driver’s seat of the car and that, after they parted ways, he went to clean up the car, but the gun was no longer there.
Defendant made a statement to the victim’s family in which he apologized for his actions, asked for forgiveness, and took full responsibility for “entering [the victim’s] home uninvited and rummaging through his things looking for items of value.”
The jury found Defendant guilty , as charged of second degree murder. • He was sentenced to life imprisonment at hard labor without the benefit of parole, probation or suspension .of sentence. .This appeal followed.

DISCUSSION

' ■ In his, only assignment of error, Defen-, dant argues that the evidence was insufficient to prove that he was guilty beyond a reasonable doubt of the offense of second degree murder. He contends that there was no proof that he had the intent to kill *146 or inflict great bodily harm and that there was no substantive evidence that he used force on the' victim or knew that Hall had the intent to kill or inflict great bodily harm on the victim. He claims-|nthat, while he. admitted Hall armed himself with a firearm during the burglary, there was no evidence to establish that he knew Hall was armed before the burglary. Further, he argues that he took the firearm from Hall when he saw Hall strike the victim with it. He also claims that, although King testified that he (Defendant) placed the victim in. a chokehold, there was no substantive evidence to corroborate King’s testimony and King benefltted from a plea bargain.
In reply, the state argues that the evidence was sufficient for the jury to find Defendant guilty of second degree murder, either through specific intent or through the perpetration of an enumerated felony. It claims that the jury rejected Defendant’s testimony that he did not touch the victim and chose to believe King’s testimony that Defendant subdued the victim with a chokehold while Hall wrestled the gun from the victim. It argues that it-was reasonable for the. jury to conclude that choking an elderly person so hard that it causes a fracture, of his spine or depriving the victim of oxygen through suffocation, while an accomplice binds the victim so that a robbery may more easily be accomplished, reflects an intent to kill or inflict great bodily harm; It further argues that the evidence showed- that the victim died during an armed robbery,-first degree robbery, simple robbery or aggravated burglary in which Defendant participated, noting the following: Defendant admitted to engaging in the robbery and burglary; the victim died after Defendant entered the victim’s house with the intent to steal money; Defendant committed a battery on the victim while in the house; the three men armed themselves with a dangerous weapon, i.e., a metal rod, prior to | ^entering the house; and Defendant armed himself with a dangerous weapon, i.é., the victim’s firearm, while in the house.
The standard of appellate review for a sufficiency of the evidence claim-is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir,2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by [^viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances estab *147 lished by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crimei. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir. 1/14/09), 2 So.3d 682, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the , evidence, not its sufficiency. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). , In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/9/06), 941 So.2d 35. The trier of fact is charged to make a credibility evalu ation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the |14fundamental. due process of law. State v. Sosa, 05-0213 (La.1/19/06), 921 So.2d 94.

Second Degree Murder

*La, R.S. 14:30.1 provides, in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender, has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated- arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
Specific intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Glover, 47,311 (La.App.2d Cir.10/10/12), 106 So.3d 129, writ denied, 12-2667 (La.5/24/13), 116 So.3d 659. Spe cific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Reed, 45,237 (La.App.2d Cir.5/26/10), 37 So.3d 1116, The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Hill, 42,025 (La.App.2d Cir,5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529. Specific intent to kill or inflict great bodily harm may be inferred from listhe extent and severity of the victim’s injuries. State v. Thornton, 47,598 (La.App.2d Cir.3/13/13), 111 So.3d 1130.
La. R.S. 14:24 provides that “all persons concerned in the commission of a-crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.”
Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of *148 any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstances: (1) if the offender is armed with a dangerous weapon; (2) if, after entering, the offender arms himself with a dangerous weapon; or (3) if the offender commits a battery upon any person while in such place, or in entering or leaving such place. La. R.S. 14:60.
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64.
First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon. La. R.S. 14:64.1.
| KjSimple robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon. La. R.S. 14:65.
The evidence presented at trial was sufficient for the jury to find Defendant guilty of second degree murder. In order to convict him of second degree murder, the state had to prove that he had the specific intent to kill or inflict great bodily harm or that he was engaged in the perpetration or attempted perpetration of an enumerated felony.
At trial, King testified that, after they broke into the victim’s house, he saw Defendant put the victim in a choke hold while Hall wrestled to get a gun out of the victim’s hand and then tied the victim’s hands behind his back. The victim’s spine was fractured during the struggle. Dr. Jin testified that such ah injury was consistent with being choked from behind. Although Defendant testified that he never touched the victim, after hearing all of the evidence, the jury chose to believe King’s testimony and rejected Defendant’s testimony. This court does not assess the credibility of witnesses or reweigh evidence. Evidence that Defendant choked the victim was -sufficient to establish that he had the requisite specific intent to kill or inflict great bodily harm.
In addition, the evidence was sufficient to establish that Defendant was engaged in the perpetration or attempted perpetration of an aggravated burglary, armed robbery, first degree robbery or simple robbery when the victim died. He admitted to entering the victim’s house with the intent to 117“hit a lick,” or commit a theft. After breaking a window of the house with a metal rod, the men subdued the victim by taking away his gun and binding his hands behind his back. The men repeatedly asked “where the money at” and rummaged through the bedrooms. The testimony showed that the men took the firearm and various coins from the victim’s house. Also, the evidence showed that the men were armed with a dangerous weapon, i.e., a metal rod, when they entered the victim’s house, that Defendant armed himself with the victim’s firearm while inside the house and that he committed a battery on the victim while inside the house.
Considering the evidence in a light most favorable to the prosecution, we find that the jury could have reasonably concluded that Defendant had the specific intent to kill or inflict great bodily harm on the victim, or that the victim’s death occurred during the perpetration or attempted perpetration of an aggravated burglary, armed robbery, first degree robbery or *149 simple robbery, even though he had no intent to kill or inflict great bodily harm. Therefore, this assignment of error is without merit.
ERROR PATENT
The.trial court did not properly advise Defendant of the time period within which to apply for post-conviction relief under La. C. Cr. P. art. 930.8. At sentencing, it advised him that he had two years from the “formality” of his conviction and sentence to file an application for post-conviction relief. The failure to properly advise the defendant is not grounds to vacate the sentence and remand for resentencing. State v. Cooper, 31,118 (La.App.2d Cir.9/23/98), 718 So.2d 1063, writ denied, 99-0187 (La.5/14/99), 741 So.2d 663. We hereby notify Defendant that, under La. C. Cr. P. arts. 914 or 922, he has two years from the date his conviction and sentence become final 'to file any applications for post-conviction relief. State v. Parker, 49,009 (La.App.2d Cir.5/15/14), 141 So.3d 839.

CONCLUSION

For the foregoing reasons, the conviction and sentence of Defendant, Dalduran J. Brandon, are hereby affirmed.
AFFIRMED.

. Defendant, King and Hall were originally charged with first degree murder, armed robbery with a firearm and aggravated burglary. On February 6, 2015, King pled guilty to manslaughter and was sentenced to 40 years at hard labor. On March 12, 2015, Hall pled guilty to attempted second degree murder and was sentenced to 50 years at hard labor without benefits.